OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court and the parties' briefs. Appellant, Joseph Peterson, appeals the decision of the Columbiana Court of Common Pleas convicting him of one count of sexual conduct with a minor in violation of R.C.2907.04(A), a felony of the third degree, and sentencing him to a prison term of five years.
 {¶ 2} Peterson challenges the trial court's denial of appropriation of funds to hire two expert witnesses. However, his motion failed to set forth a particularized need for the expenditure of funds. Thus, the trial court did not abuse its discretion by denying that motion. Next, Peterson challenges the effectiveness of his trial counsel in failing to properly draft the request for expert funds. However, Peterson cannot show prejudice by counsel's failure and thus this claim is without merit. Finally, Peterson challenges both the sufficiency and the weight of the evidence. Because the State presented adequate evidence regarding each element of the offense and we cannot say that the jury clearly lost its way in finding him guilty of one count of sexual conduct with a minor, the decision of the trial court is affirmed.
 {¶ 3} On May 26, 2005, Peterson was indicted by the Columbiana County Grand Jury for two counts of unlawful sexual conduct with a minor. In the indictment, Peterson was accused of engaging in vaginal intercourse and fellatio with the victim on multiple occasions when he knew that she was older than 13 but less than 16 years old. Although the two counts listed in the indictment were identical, the State elaborated in the Bill of Particulars that Count One occurred in Fairfield Township while Count Two was alleged to have happened in the Village of Columbiana. Peterson pled not guilty to the two counts and was brought to trial before a jury.
 {¶ 4} At trial, Brian Knight, a counselor at the Family Recovery Center, was the first witness to take the stand for the State. Knight testified that, while visiting with students from Southside Middle School, he had spoken with the victim who he had been meeting with every Thursday. The victim indicated to Knight that she had a new boyfriend and that Knight and he might know each other as they were around the same age. Knight testified that he would be twenty-nine in a week. It turned out that Knight had *Page 2 
gone to high school with Peterson and that they were acquaintances. The victim disclosed to Knight that her relationship with Peterson involved sexual activity. She told Knight that she was concerned about "pregnancy control." She wanted to use condoms but Peterson said "No, that he would just use other means." She also told Knight that they had gotten caught behind Crestview School by a police officer. In response to this conversation with the victim, Knight contacted his supervisor. She instructed him to call Children Services who in turn told him to inform the police, which he did. Knight further testified that he spoke with the school principal about the allegations.
 {¶ 5} The next witness to take the stand was Mary Ann Johnson, the victim's mother. She testified that the victim was born on May 10, 1990. Johnson testified that she has two other daughters and that she knew Peterson through her oldest daughter, who lived at the Peterson residence due to issues with her stepfather. Johnson explained that her oldest daughter told her that Peterson and some of his sisters, along with the victim and her sister, had been driving together to a gym to work out. They were originally going as a group; however, Johnson later learned that Peterson and the victim began traveling there alone. She also learned that Peterson was twenty-eight years old.
 {¶ 6} On April 26, 2005, Johnson was called to the Southside Middle School where she was met by Columbiana Children's Services and the Columbiana Police Department. Johnson testified that her daughter was also there and was "a mess", crying and shaking. Johnson was shocked by the allegations regarding her daughter and Peterson's relationship. At no time did she see anything that would lead her to believe that her daughter had been sexually active. Nevertheless, Johnson allowed her daughter to be interviewed and was asked to bring her back again so that her daughter could make a phone call to Peterson. However, Johnson was not allowed to be present when the phone call was made.
 {¶ 7} After her mother was done testifying, the victim took the stand. She testified that she was born on May 10, 1990 and that at the time of the alleged conduct she had been attending Southside Middle School. She said that she met Peterson through her older sister. She testified that Peterson told her that he was twenty eight. She began *Page 3 
going to the Creekside workout facility in Boardman with Peterson and his sisters.
 {¶ 8} According to the victim, Peterson then started to pick her up by herself and take her to the gym. Soon after, the victim claimed that sexual activity between the two of them would take place in Peterson's car, a silver Lincoln. She stated that it occurred once at his grandparent's house, once at "Camelot," and "quite a few times at 7 14." The first time they had sex, however, was outside of the old Crestview School. She testified that the initial sexual activity occurred in the front passenger seat, with their clothes off and the seat reclined. Peterson ejaculated but did not use a condom.
 {¶ 9} The victim then testified that most of the sexual activity occurred at the 7 14 Restaurant where Peterson would park his car between semi tractor trailers. She stated that they had sex in both the front and the back seats. He would ejaculate and then wipe himself off with his gym towel.
 {¶ 10} The victim explained that there was one occasion behind the school that stood out in her mind because an officer pulled up to their car while Peterson was on top of her. Peterson then moved to the seat next to her. They both started to get dressed. She then explained,
 {¶ 11} "So, I was kind of hiding behind Joe getting dressed at the time. And Joe opened his door and he stepped out and I stepped out and we had our heads down, and the cop said, `All you can do is move on.' And we got in the car and left."
 {¶ 12} The testimony then turned to the time at which the victim discussed this relationship with her counselor. The victim admitted that when the police and Children Services arrived at her school she initially recanted her story. She told them that she didn't know who Peterson was and that she had never seen him before. She said she did this because she cared for Joe and was afraid of getting him in trouble. She changed her story again when Officer John Jay told the victim that Peterson was "using her." She explained that this "ticked [her] off." She then admitted to having a sexual relationship with Peterson.
 {¶ 13} The victim was asked to return later that day so that she could call Peterson and have the conversation recorded by the police. Officer Jay told the victim what to say, *Page 4 
and then the following conversation took place:
 {¶ 14} Peterson: Yeah.
 {¶ 15} Victim: Hey.
 {¶ 16} Peterson: What's up?
 {¶ 17} Victim: Nothing. What are you doing?
 {¶ 18} Peterson: I'm at work.
 {¶ 19} Victim: Oh, you're at work. Did you get your new (unintelligible) yet?
 {¶ 20} Peterson: Yeah, I've got it.
 {¶ 21} Victim: (unintelligible) something?
 {¶ 22} Peterson: Aero Tech.
 {¶ 23} Victim: Oh. Hey I got to talk to you.
 {¶ 24} Peterson: Okay.
 {¶ 25} Victim: Um . . . I'm, uh, late with my period and my mom wants me to go get tested.
 {¶ 26} Peterson: Okay.
 {¶ 27} Victim: Are you sure you pulled out every time?
 {¶ 28} Peterson: Yep.
 {¶ 29} Victim: Are you positive?
 {¶ 30} Peterson: Huh?
 {¶ 31} Victim: Are you positive?
 {¶ 32} Peterson: Positive.
 {¶ 33} Victim: All right.
 {¶ 34} Peterson: I ain't worried.
 {¶ 35} Victim: So I ain't got nothing to worry about then?
 {¶ 36} Peterson: Nope.
 {¶ 37} Victim: Good.
 {¶ 38} Peterson: I know for a fact I did. All right?
 {¶ 39} Victim: Okay. Well, what — what should I tell my mom?
 {¶ 40} Peterson: Nothing. People are late. It happens. *Page 5 
 {¶ 41} Victim: Okay.
 {¶ 42} Peterson: Fuck, I have six sisters, they've — they've been late all the time.
 {¶ 43} Victim: All right.
 {¶ 44} Peterson: All right?
 {¶ 45} Victim: All right. Well, I'm going to let you go, okay?
 {¶ 46} Peterson: All right.
 {¶ 47} Victim: All right. Bye.
 {¶ 48} Peterson: Bye.
 {¶ 49} After the tape was played, the victim testified that it was in fact the same conversation she had while at the police department. She further testified that the other voice on the recording belonged to Peterson, who she had spoken to on the phone before.
 {¶ 50} John Jay, an investigator on the case, took the stand next and confirmed that he instructed the victim on what to say during the conversation. He then testified regarding his further investigation of the matter. More specifically, Jay questioned the victim about her and Peterson being caught by a law enforcement officer. She told Jay that the officer was driving a light colored Dodge Intrepid and was not dressed in a typical uniform of a deputy sheriff. Jay concluded that she must have been talking about Fairfield Township constable, Arless Webb. Consequently, Jay phoned Arless Webb who confirmed that he had in fact run across a couple, with the male matching Peterson's description.
 {¶ 51} With regards to the investigation of physical evidence in this case, Jennifer Akbar, a DNA expert, took the stand to testify on behalf of the State. Akbar completed tests on several samples retrieved from the backseat of Peterson's car. She concluded that two DNA profiles were present, one consistent with Peterson, found in the form of semen, and one consistent with the victim. Akbar admitted on cross-examination that she only ran DNA tests on the samples taken from the back seat. She also testified that she could not determine the source of the victim's DNA and that it could have come from *Page 6 
saliva, sweat or blood.
 {¶ 52} Next, Arless Webb took the stand to testify regarding his encounter with a couple behind the old Crestview School. He explained that when he came across the vehicle, he saw two people sitting in the back seat. The male was nude from the waist up. However, he couldn't tell if the female was clothed. He remembered what the male looked like but testified that he never saw the female. He told them that it was not the place for that and instructed them to leave. After the conclusion of Webb's testimony, the State rested.
 {¶ 53} The first witness to take the stand on behalf of Peterson was Rachel Bishop. She testified that her husband was in the military and she was trying to deal with the stress of him being gone. She went to the Peterson's house to visit and she started talking with Peterson. The two left the house to go driving around and eventually Peterson stopped and parked behind the old Crestview School. She said that she was emotional so Peterson consoled her. Bishop explained that one thing led to another and they ended up having intercourse in the backseat. They were interrupted, however, when Peterson shoved her off of him and said, "Shit, get dressed." Bishop testified that there was an officer sitting there in a constable's car and that he told the couple to leave.
 {¶ 54} On cross-examination, Bishop testified that she never told anyone about the incident behind the school until the night before she testified. Bishop was initially supposed to be called solely as a character witness. However, she said she was overcome with guilt so she told Peterson's mother what had happened.
 {¶ 55} Peterson's mother testified briefly, and then Peterson took the stand on his own behalf. He admitted taking the victim to the gym by herself. He viewed her as a buddy to lift with as she was very athletic. They continued going to the gym for several weeks. However, Peterson explained that he stopped taking the victim to the gym after an incident where he stopped at a "sex shop" where he planned on purchasing a "penis pump." Upon exiting the store, he found her masturbating in his car. He said that the victim repeatedly told him that she was interested in him but he told her that she was too young for him. *Page 7 
 {¶ 56} With regards to the audiotape purporting to be him speaking with the victim, Peterson then testified that it was not his voice on the tape. He stated that the voice belonged to Alex Exline, a co-worker. Peterson testified that Exline had done this on previous occasions and was trying to play a joke on him. After hearing the tape for the first time, Peterson stated that he approached Exline and told him that he thought it was him on the tape. He told Exline that, "I'm not getting in trouble for this." Exline then contacted the police and signed a paper stating that it wasn't him on the tape. Peterson then admitted to telling Exline, "You should have told them it was you, it's funny how accidents occur at work." After this testimony, Peterson rested.
 {¶ 57} The State then called Exline to testify as a rebuttal witness. Exline testified that it was not him on the tape, which was again played in front of the jury. He in fact testified that it was Peterson's voice on the tape.
 {¶ 58} At the conclusion of Exline's testimony, the State again rested. After reviewing all of this evidence, the jury returned a guilty verdict on one count of the indictment. Peterson was convicted of one count of sexual conduct with a minor and sentenced to a five year prison term.
 Defendant's Expert at State Expense {¶ 59} As his first assignment of error, Peterson states:
 {¶ 60} "The trial court committed reversible error and an abuse of discretion by denying Appellant's motions for appropriation of funds to hire experts to perform forensic DNA analysis and forensic tape analysis."
 {¶ 61} Both the United States Supreme Court and the Ohio Supreme Court have consistently held that an indigent criminal defendant is entitled to an expert witness at the State's expense under certain conditions. "As a matter of due process, indigent defendants are entitled to receive the `raw materials' and the `"basic tools of an adequate defense,"' which may include provision of expert psychiatric assistance." State v.Mason (1998), 82 Ohio St.3d 144, 149, 694 N.E.2d 932, quoting Ake v.Oklahoma (1985), 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53; see, also, Britt v. North Carolina (1971), 404 U.S. 226, 92 S.Ct. 431,30 L.Ed.2d 400; State v. Broom (1988), 40 Ohio St.3d 277, *Page 8 533 N.E.2d 682.
 {¶ 62} "Due process, as guaranteed by the Fifth andFourteenth Amendments to the United States Constitution and Section 16, Article I
of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." Mason at syllabus.
 {¶ 63} The decision to appoint an expert is left to the trial court's broad discretion and its decision will not be reversed absent an abuse of that discretion. State v. Wells (Mar. 22, 2000), 7th Dist. No. 98-JE-3, at 8; see, also, State v. Jenkins (1984), 15 Ohio St.3d 164,473 N.E.2d 264, paragraph four of the syllabus. The phrase "abuse of discretion" connotes more than an error of law or judgment; it implies the trial court acted unreasonably, arbitrarily, or unconscionably.State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.
 {¶ 64} When deciding whether to appoint an expert witness at the State's expense, the trial court must consider the following three factors: (1) the effect of the defendant's private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and, (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided. Mason at 149. When considering these factors, the trial court must consider the value of the expert assistance to the defendant's proper representation at either the guilt or sentencing phase and the availability of alternative devices that would fulfill the same functions as the expert assistance sought. Jenkins at paragraph four of the syllabus.
 {¶ 65} In order to receive an expert witness at the State's expense, the defendant must demonstrate more than a mere possibility of assistance from an expert. State v. Campbell (2000), 90 Ohio St.3d 320,328, 738 N.E.2d 1178; State v. Abelt (2001), 144 Ohio App.3d 168, 174,759 N.E.2d 847. At a minimum, the indigent defendant must *Page 9 
present the trial judge with sufficient facts which will demonstrate a particularized need for the expert requested. State v. Nields (2001),93 Ohio St.3d 6, 12, 752 N.E.2d 859; Abelt. "Undeveloped assertions that the proposed assistance would be useful to the defense are patently inadequate." State v. Wright (Sept. 27, 2001), 7th Dist. No. 97 CO 35, at * 2.
 {¶ 66} In the present case, Peterson moved the court for appropriation of funds for a DNA expert stating in his motion:
 {¶ 67} "Now comes the Defendant, Joseph E. Peterson, by and through undersigned counsel, Carl Joseph King, and respectfully requests the Court to authorize the expenditure of $1,000 for a DNA expert to review the results of a Lab Report (December 23, 2005 State's Supplement to Discovery), which the state intends to introduce into evidence.)
 {¶ 68} Peterson also moved for the appropriation of funds for an expert to review the taped telephone call to determine whose voice was actually recorded. The motion stated:
 {¶ 69} "Now comes the Defendant, Joseph E. Peterson, by and through undersigned counsel, Carl Joseph King, and respectfully requests the Court to authorize the expenditure of $2,500.00 to Forensic Tape Analysis Inc., 6242 Jones Road, Burlington, WI, 53105, and phone No. 1-262-348-1313 for a verbatim voice identification of the tape telephone conversation of April 26, 2005. Attached to this motion is a statement from Forensic Tape Analysis Inc. setting forth a fee schedule."
 {¶ 70} These motions fail to set forth a particularized need for the expenditure of funds as they clearly don't provide enough information for the trial court to have made an informed decision based on the factors enumerated in Mason. Moreover, appellate counsel concedes that these motions were inadequate. Therefore, we will address this claim in the context of Peterson's second assignment of error which claims:
 {¶ 71} "Appellant was denied his right to due process and of assistance of counsel as guaranteed by the Sixth andFourteenth Amendments of the United States Constitution and Ohio Constitution since his trial counsel provided ineffective assistance."
 Ineffective Assistance of Counsel *Page 10 {¶ 72} In his brief, Peterson argues that "the most glaring error by trial counsel was his failure to properly draft and argue Appellant's request for expert DNA and forensic tape analysis. * * *Appellant's trial counsel failed to address the basic two prong test in his motions for appropriation of funds thereby failing to advance a `particularized showing' that an expert would aid in Appellant's defense."
 {¶ 73} In Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674, the United States Supreme Court established the process for evaluating a claim of ineffective assistance of counsel. The court held that an appellant must first show that his counsel's performance was deficient. Id. at 687. An appellant demonstrates this by "showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by theSixth Amendment." Id. Second, the appellant must show that his counsel's deficient performance prejudiced him to the effect that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.
 {¶ 74} In State v. Lytle (1976), 48 Ohio St.2d 391, 358 N.E.2d 623, the Ohio Supreme Court held that:
 {¶ 75} "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant'sSixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." Id. at 396-397.
 {¶ 76} In the present case, we conclude that regardless of whether counsel's performance in drafting the motions was deficient, Peterson was not prejudiced by this deficiency.
 {¶ 77} Peterson argues that during the trial, the State's DNA expert stated that she did not test the front seat of Peterson's car for DNA samples; she only tested the back seat of the car. Peterson claims that if counsel would have made a proper motion for appropriation of funds, "the trial court would have had no choice but to appropriate funds *Page 11 
for a defense expert, and the front seat would have provided the Appellant with the `basic tools' and testimony to confront and properly defend the allegation of sexual conduct in the front seat."
 {¶ 78} However, even if an expert took the stand and testified that there was no evidence of the victim's DNA on the front seat, this piece of information would not disprove the allegations of sexual conduct in the back seat where the State's expert did find the victim's DNA along with Peterson's semen. Thus, it is unclear how any additional DNA evidence would have affected the outcome of the trial; especially given the fact that the two counts were not broken down into activity in the front seat versus activity in the backseat, rather the counts were broken down by geographical location of the activity. Accordingly, Peterson has not demonstrated that he was prejudiced by his counsel's failure to obtain expert assistance regarding DNA.
 {¶ 79} Peterson likewise claims that counsel was ineffective for failing to properly draft a request for appropriation of funds for forensic tape analysis of the recorded phone conversation between the victim and the person alleging to be him. He claims he was prejudiced by his inability to challenge the tape's authenticity by the most reliable of means.
 {¶ 80} However, the trial in this case could not be deemed "unfair" based on the lack of an expert on this issue given the "availability of alternative devices that would fulfill the same functions as the expert assistance sought." State v. Jenkins (1984), 15 Ohio St.3d 164,473 N.E.2d 264, paragraph four of the syllabus. For example, as Peterson points out that the speaker on the tape stated that he had six sisters when in reality Peterson had only five sisters. This is a factual inaccuracy that could have been and in fact was challenged at trial. Additionally, Peterson claimed at trial that the person who answered his phone was a coworker pretending to be Peterson. This person, Alex Exline, was ultimately called to the stand. Accordingly, Peterson was given the chance to cross-examine him. And, the jury was able to hear both he and Exline's voices.
 {¶ 81} Accordingly, Peterson was not prejudiced by his counsel's unarftul request for the appropriation of funds. Thus, this assignment of error is meritless. *Page 12 
 Insufficiency of Evidence {¶ 82} As his next assignment of error, Peterson claims:
 {¶ 83} "Appellant's conviction on the first count of the indictment for unlawful sexual conduct with a minor violated the United States and Ohio Constitutions as there was insufficient evidence to support the conviction as a matter of law."
 {¶ 84} The Ohio Supreme Court has set forth a test to determine whether the evidence submitted in a trial was sufficient for the trier of fact to determine a crime had been proven beyond a reasonable doubt. See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. The duty of the appellate court when reviewing whether evidence presented was sufficient to support a criminal conviction "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." Id. at ¶ 2, 574 N.E.2d 492 of the syllabus. We must determine, after viewing the evidence in a light most favorable to the State, whether the fact-finder could have found that the prosecution proved all of the essential elements of the crime beyond a reasonable doubt. Id.
 {¶ 85} In this case, Peterson was charged and convicted of unlawful sexual conduct with a minor in violation of R.C. 2907.04 (A), which states:
 {¶ 86} "No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard."
 {¶ 87} Peterson claims that the State failed to prove two elements of the offense beyond a reasonable doubt. First, Peterson claims that the State failed to prove the ages of both Peterson and the victim. And second, Peterson claims the State failed to prove that Peterson and the victim were not married.
 {¶ 88} More specifically, Peterson claims that the State failed to enter certified birth certificates into evidence to prove the ages of Peterson and the victim in violation of the best evidence rule. However, Peterson fails to cite any legal authority which demands such documentation. To the contrary, prior caselaw indicates that testimony regarding *Page 13 
one's birth date is sufficient evidence. See State v. Selmon (Jan. 9, 2006), 5th Dist. No. 05 CA 49, State v. Potter (Dec. 7, 2005), 9th No. 05CA0029-M.
 {¶ 89} Here, the victim testified that her birth date was May 10, 1990 and Peterson's mother testified that he was born on March 14, 1977. Additionally, Brian Knight testified that he was 28 and that he graduated from high school with Peterson. Accordingly, there was sufficient evidence in the record to prove the element of age.
 {¶ 90} Peterson essentially claims that the State failed to meet its burden of proof on the element of the parties' non-marital status as the State never explicitly asked the question of whether Peterson and the victim were married. However, it is well settled that the State may rely on circumstantial evidence to prove an essential element of an offense, because "circumstantial evidence and direct evidence inherently possess the same probative value[.]" State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus.
 {¶ 91} "`Circumstantial evidence' is the proof of certain facts and circumstances in a given case, from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind." State v. Duganitz (1991),76 Ohio App.3d 363, quoting Black's Law Dictionary (5 Ed.1979) 221. "Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." Jenks, 61 Ohio St.3d at 272.
 {¶ 92} The lack of a spousal relationship between the offender and the victim is an element that must be proven for an unlawful sexual conduct conviction. When the State fails to affirmatively ask the victim whether she was the spouse of the offender, however, the trier of fact is permitted to infer from the testimony or circumstances that a defendant and his victim are not married.
 {¶ 93} For example, in State v. Patton (Apr. 8, 1992), 1st Dist. No. C-910479, the court accepted circumstantial evidence that the twelve-year-old victim was not the spouse of the offender, her mother's boyfriend. Id. at 5-6. Likewise, in State v. Sweeney (Apr. 8, *Page 14 
1982), 8th Dist. No. 43823, the court found that a police officer's testimony that the victim was single, as was defendant, to be sufficient evidence that they were not spouses. Id. at 5-6. Finally, in State v.Brown (Sept. 7, 2006), 8th Dist. No. 86577 the court accepted testimony that the defendant and victim were "boyfriend" and "girlfriend". Additionally, the victim testified that she and defendant had met at church, become friends, begun a romantic relationship, and then moved in together. She testified that after they moved to another apartment, the relationship "really didn't change." Id. at 3.
 {¶ 94} Here, the State's witness Brian Knight testified that the victim disclosed to him that she had a new "boyfriend." The victim testified that she only knew Peterson through her sister for the limited purpose of traveling to the workout facility. Peterson described his relationship with the victim as "kind of like a buddy to lift with." Furthermore it was established that the victim was in middle school and did not reside with Peterson.
 {¶ 95} Given all of this testimony, it appears that the State placed enough circumstantial evidence into the record to support a jury's finding that the victim and Peterson were not husband and wife. Accordingly, this assignment of error is meritless.
 Manifest Weight {¶ 96} As his final assignment of error, Peterson asserts:
 {¶ 97} "The verdict reached by the jury on the first count for unlawful sexual conduct with a minor violates the United States and Ohio Constitutions since the verdict was against the manifest weight of the evidence."
 {¶ 98} When determining whether a verdict is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. "Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its *Page 15 
effect in inducing belief." Id.
 {¶ 99} The test a reviewing court follows is that it sits as a "thirteenth juror" and determines whether, considering all the evidence, the State met its burden of persuasion and the conclusion reached by the trier of facts is supported by the inclination of the greater amount of the evidence. State v. Fullerman, 7th Dist. No. 99CA314, 2001-Ohio-3969, citing Thompkins, 78 Ohio St.3d at 387. When making a decision on manifest weight of the evidence, the appellate court is not required to view the evidence in a light most favorable to the prosecution, but may consider all of the evidence produced at trial. Id. at 390. This discretion to grant a new trial, however, should only be exercised in an exceptional case in which the evidence weighs heavily against the conviction. Id. at 387. In order to reverse a conviction from a trial by jury, a unanimous concurrence of all three appellate judges is required. Id. at 389.
 {¶ 100} Here, Peterson claims the verdict was against the manifest weight of the evidence based upon the fact that the victim's testimony that sexual conduct occurred in the front seat of the car went uncorroborated and that her testimony that sexual conduct occurred in the backseat was refuted by the testimony of Constable Arless Webb and Rachel Bishop.
 {¶ 101} However, Peterson fails to cite to any authority suggesting that testimony regarding sexual conduct must be corroborating before a reasonable jury could believe the allegations. Moreover, even if there was such a requirement, Peterson would not necessarily be prejudiced in this case as he was only convicted of one count of sexual conduct with a minor which could have resulted from the corroborated testimony regarding conduct in the backseat.
 {¶ 102} Peterson would argue, however that the victim's testimony regarding the conduct in the backseat was refuted by the testimony of both Bishop and Webb. More specifically, Peterson claims that the victim testified that the officer was watching her and Peterson as they were getting dressed. She further testified that she and Peterson both stepped out of the car. Peterson points out that Webb testified that he could not tell what the female looked like or whether she was even dressed. Peterson further states that *Page 16 
Bishop's story presented a reasonable explanation as to why the victim's story was inaccurate. However, it is possible that the jury chose to disbelieve Bishop as she came forward only after the victim gave her testimony. Moreover, the jury could have found the factual inaccuracies in the victim's testimony to be inconsequential.
 {¶ 103} Finally, Peterson claims that the fact that he was only convicted on the charge in the indictment regarding activity occurring behind the school and not the count involving activity occurring at the 7 14 Restaurant is evidence that the jury clearly lost its way. In essence, Peterson is claiming that there may be inconsistent verdicts.
 {¶ 104} However, consistency between verdicts on several counts of an indictment is unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal.State v. Adams (1978), 53 Ohio St.2d 223, 374 N.E.2d 137, vacated in part on other grounds, 439 U.S. 811, 99 S.Ct. 69, 58 L.Ed.2d 103. Each count of a multi-count indictment is deemed distinct and independent of all other counts, and thus inconsistent verdicts on different counts do not justify overturning a verdict of guilt. See State v. Hicks (1989),43 Ohio St.3d 72, 78, 538 N.E.2d 1030; State v. Brown (1984),12 Ohio St.3d 147, 465 N.E.2d 889, paragraph one of the syllabus; State v.Washington (1998), 126 Ohio App.3d 264, 276, 710 N.E.2d 307. "[T]he sanctity of the jury verdict should be preserved and could not be upset by speculation or inquiry into such matters to resolve the inconsistency." State v. Lovejoy (1997), 79 Ohio St.3d 440, 444,683 N.E.2d 1112.
 {¶ 105} Accordingly, all of Peterson's arguments regarding the manifest weight of the evidence are meritless.
 {¶ 106} As all of Peterson's assignments of error are meritless, the judgment of the trial court is affirmed.
Donofrio, J., concurs.
 Waite, J., concurs. *Page 1