[Cite as *State v. Henderson*, 2017-Ohio-412.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                    Court of Appeals No. OT-15-047

    Appellee                            Trial Court No. 13 CR 135

v.

Kayla Henderson

    Appellant

and

State of Ohio                                    Court of Appeals No. OT-15-048

    Appellee                            Trial Court No. 13 CR 134

v.

Beau Hutchinson                          **DECISION AND JUDGMENT**

    Appellant                           Decided:  February 3, 2017

* * * * *

**JENSEN, P.J.**

{¶ 1} In this consolidated appeal, defendants-appellants, Beau J. Hutchinson and Kayla Henderson, appeal the November 12, 2015 judgment of the Ottawa County Court of Common Pleas convicting them of child endangering and sentencing them to 36 months' imprisonment in connection with the death of Henderson's two-month-old son, K.H.  For the reasons that follow, we affirm the trial court judgment.

## A. Background

**{¶ 2}** On the evening of March 9, 2012, Kayla Henderson and her boyfriend, Beau Hutchinson, went to the home of Hutchinson's cousin, Crystal Albright, for a get-together with friends. They brought Hutchinson's four-year-old daughter, A.H., Henderson's two-year-old daughter, M.H., and Henderson's then-seven-week-old son, K.H. Also at the party were Albright's boyfriend, Eric Weinheimer, their three-year-old son, R.W, her 12-year-old son, D., her nine-year-old nephew, L.,[1] and friends Jeannie Hollinger, Wayne Ross, and Christy and Casey Leow.

**{¶ 3}** Earlier that day, Hutchinson and Henderson ran errands and left K.H. with Henderson's mother, Rachel Prange, from approximately 11:00 a.m. to 2:30 p.m. When Hutchinson and Henderson returned, they bathed Henderson's children and got ready for the party. They picked up A.H. from her mother's house and arrived at Albright's home around 5:00 p.m., before any of the other guests and before Albright got home from work.

**{¶ 4}** When Albright got home, she briefly held K.H., but quickly handed him back to Henderson for a diaper change. Albright then asked Hutchinson to go to the store to buy some items for the party. Hutchinson and Henderson ran the errand together and left the children with Albright for about an hour. Albright cleaned up around the house and started getting dinner ready. The Leows arrived shortly after Hutchinson and Henderson left for the store. Hollinger and Ross arrived around 7:00 p.m.

---

[1] The last names of D. and L. do not appear in the record.

2.

**{¶ 5}** Albright made tacos for dinner and everyone ate. At some point, both Hollinger and Christy Leow held K.H. Christy fed him part of a bottle. After dinner, the adults went into the sunroom to smoke outside the presence of the children. The older boys played videogames in a bedroom, and the younger children played and watched television in the living room. The sunroom was separated from the living room by a kitchen and a short hallway. K.H. was in his car seat in the living room with the younger children.

**{¶ 6}** At some point after dinner, A.H. vomited. Hutchinson and Henderson bathed her, changed her, and lay her on the couch in the living room, and she fell asleep. They put M.H. in one of the bedrooms so she could sleep. Around 11:00 p.m., the Leows left. Albright went to the kitchen to clean up the mess from dinner. A.H. was asleep on the couch, and K.H. was asleep in his car seat. R.W. was tired, so Albright laid out a small foldable couch, tucked him in, and left a Barney movie playing for him on the television. She then joined Hutchinson, Henderson, Hollinger, and Ross in the sunroom.

**{¶ 7}** About 15-25 minutes after Albright joined her guests outside, Hutchinson said he was going to check on the kids. Seconds later, before Hutchinson even got to the end of the hallway, he yelled, "Oh my god! Call 9-1-1!". Weinheimer followed Hutchinson into the kitchen, and Hutchinson had K.H. in his arms. Hutchinson said that R.W. had dropped or thrown the baby. There was no blood or visible injury to K.H., but he was blinking his eyes and it was apparent that there was something wrong with him.

3.

{¶ 8} Hutchinson put K.H. in his car seat, he and Henderson gathered their things, and they rushed out the door. Albright told them she would take care of A.H. and M.H. while they took K.H. to the hospital. Instead of going straight to the hospital, however, Hutchinson and Henderson took a detour and picked up Henderson's grandmother, Barb Goehringer. Goehringer then drove the family to Magruder Hospital. On the way, Hutchinson called 9-1-1 to request a police escort. Henderson called the hospital to tell them they were coming. Meanwhile, K.H. struggled to breathe.

{¶ 9} K.H. arrived at Magruder Hospital at 11:55 p.m. He was noted to be in "severe distress, unresponsive and cyanotic with only occasional agonal respirations." Breath sounds and brachial pulses were absent. He was resuscitated with bag and mask ventilation, then intubated. He had a hematoma on the left side of his head and an abrasion in the right parietal region. K.H. was transferred to Toledo Mercy St. Vincent Medical Center by life flight. Hutchinson accompanied him

{¶ 10} Once at St. Vincent, a CT scan of K.H.'s head was performed, revealing that K.H. had suffered significant intracranial injury, including bilateral occipital skull fractures, bilateral subarachnoid and subdural hemorrhages, and intracerebral edema. K.H.'s prognosis was very poor and the treating physician did not believe K.H.'s injuries to be consistent with the history reported by Hutchinson and Henderson. K.H. was transferred to the University of Michigan Mott Children's Hospital ("U of M").

4.

**{¶ 11}** K.H.'s father, Jon Henderson, who lives in California and is in the Navy, was on a ship when the injury occurred. Henderson notified Jon of K.H.'s injury and the Red Cross assisted in transporting him back to the area. Children's Services and the Ottawa County sheriff were also notified.

**{¶ 12}** Once at U of M, K.H.'s prognosis remained poor. Treating physicians suspected abusive head trauma. K.H. was ultimately declared brain dead. Jon, who was granted custody of K.H. and M.H. during K.H.'s hospitalization, made the decision on March 17, 2012, to remove K.H. from life support. K.H. succumbed to his injuries that day.

**{¶ 13}** On August 29, 2013, Hutchinson and Henderson were both charged in a two-count indictment with permitting child abuse, a violation of R.C. 2903.15(A), a first-degree felony, and child endangering, a violation of R.C. 2919.22(A), a third-degree felony. The case was tried to a jury beginning August 17, 2015, and ending August 20, 2015. The jury acquitted them of permitting child abuse, but convicted them of child endangering. The trial court ordered presentence investigation reports, and sentenced them on November 12, 2015, to a prison term of 36 months. Both Hutchinson and Henderson appealed and they assign the following errors for our review:

> I. The Trial Court erred when it denied the Motion to Exclude Report(s)/Record(s) and Testimony of State Witness(es) pursuant to Ohio Evid. R. 702 and 703 at both Hearing and at Trial.

5.

II. The Trial Court erred when it denied the Motion for Appropriation of Funds for a Defense Expert.

III. The Trial Court erred in overruling the motion for acquittal pursuant to Crim.R. 29.

IV. The Trial Court erred when the Prosecutor, during opening statement, throughout Trial, and pervasively in closing arguments, indicated her opinion as to credibility of witnesses during the trial. The Trial Court erred by not intervening sua sponte, due to the abuse of privilege.

V. The Trial Court erred in sentencing Appellants to the maximum sentence.

## B. Law and Analysis

### 1. Motion to Exclude Reports, Records, and Testimony of State Witnesses

{¶ 14} In their first assignment of error, Hutchinson and Henderson argue that the trial court erred when it denied their motion to exclude the expert reports and the testimony of the state's expert witnesses, Bethany Mohr, M.D., Randall Schlievert, M.D., and Bader Cassin, M.D. Dr. Mohr was one of K.H.'s treating physicians at U of M; Dr. Schlievert is the director of the child abuse program at St. Vincent Medical Center, but did not treat K.H.; and Dr. Cassin is the forensic pathologist who conducted K.H.'s autopsy. Before addressing Hutchinson and Henderson's first assignment of error, we briefly summarize these witnesses' trial testimony.

6.

## a. The Experts' Testimony

{¶ 15} Dr. Mohr testified that she first saw K.H. on March 12, 2012. When she examined him, he was heavily sedated by medications aimed at decreasing the pressure in his skull. He was being monitored for seizures by electrodes placed on his head and in his skull. Externally, Dr. Mohr observed that K.H. had an abrasion on his nose, but it was unclear whether he first presented with this injury or whether it occurred after his admission to one of the three hospitals. She lifted the wrap covering the electrodes and saw bruising and swelling on the left side of his head.

{¶ 16} Dr. Mohr testified that internally, K.H. suffered from intracranial hemorrhaging, both subdural and subarachnoid, and a complex skull fracture. She described that the fracture had three branches and extended from the left side of his skull across the front of his skull, across the top, and across the back. She said that there also appeared to be a smaller fracture below the complex fracture. Dr. Mohr explained that it would require significant force to produce the injury. She indicated that this was the type of injury she would expect to result from a motor vehicle accident where the child was not restrained, something heavy rolling over the child's head, or a fall from several stories high.

{¶ 17} Dr. Mohr testified that in treating K.H., she reviewed the medical records and spoke to Hutchinson and Henderson to obtain a history. She wanted to speak to Henderson first, but Hutchinson was insistent that she speak with him first because he

7.

was concerned about Henderson's mental state given that she had recently been told that K.H. would likely not survive. Hutchinson told her that they had taken K.H., A.H., and M.H. to Albright's house for dinner, they were smoking in a three-season room, he went to check on the children, heard a boom, and saw K.H. on the kitchen floor with R.W. next to him. He did not specifically state that R.W. had dropped K.H., but this was his implication. Dr. Mohr said that the history provided by Henderson was similar, except that Henderson clarified that K.H. had been in a car seat. Earlier medical documentation indicated that he had been in a swing.

{¶ 18} Dr. Mohr opined that K.H.'s injuries could not have been caused by being dropped by a three-year-old. She remarked that "that history is entirely inconsistent and does not provide in any way an explanation for K.H.'s injuries or death." Dr. Mohr expressed that in addition to the injuries K.H. sustained, she also had concerns that there had been a delay in seeking medical treatment for K.H. She said that secondary injury occurs from not getting enough oxygen, and the failure to seek medical care decreases the likelihood of survival. She explained:

> [K.H.'s] death due to his brain swelling and extensive brain injury
> from the swelling could either be from initial injury, whatever caused the
> skull fracture, or could also be from not getting enough oxygen, but most
> likely is a combination of both in terms of sustaining an injury and then
> over time either breathing very shallow, not getting enough oxygen, and

8.

that causing a worsening brain injury, so it is most likely a combination of the two.

**{¶ 19}** Dr. Mohr testified that she has seen hundreds of babies who have been dropped by their caregivers, and based on her experience, and based on the medical literature, those babies sustain simple linear parietal skull fractures. She explained that in those cases, they do not expect to see intracranial hemorrhaging and those babies do not die from their injuries. Dr. Mohr ultimately opined that K.H.'s injuries resulted from physical abuse. On cross-examination, Dr. Mohr provided her opinion that K.H.'s injuries were sustained before the get-together at Albright's. She conceded that she cannot say who inflicted K.H.'s injuries.

**{¶ 20}** The state moved for admission of a seven-page summary entitled Child Protection Team Consultation Part I, a five-page summary entitled Child Protection Team Consultation Part 2, and a three-page summary entitled Child Protection Team Interim Summary, all written by Dr. Mohr. Defense counsel objected, arguing that the contents contained hearsay in the form of references to other records and other statements from witnesses besides the defendants. The court admitted the report into evidence over defense counsel's objections.

**{¶ 21}** The state next called Dr. Schlievert. Before he testified, defense counsel objected to his testimony on the basis that (1) his opinions were formed on incomplete records from the three hospitals where K.H. was treated, and (2) he never examined K.H.

9.

The state responded that it anticipated that the medical records would be admitted into evidence, and it clarified that Dr. Schlievert relied on the two Child Protection Team Consultations "as far as Doctor Mohr was concerned." Defense counsel pointed out that no records custodian would be coming from U of M, thus there was no way to admit any additional records from U of M relied upon by Dr. Schlievert. The state disagreed that Dr. Schlievert had relied on any additional U of M records. The court allowed Dr. Schlievert to testify.

{¶ 22} Dr. Schlievert described his background, education, and current position as director of the child abuse program and vice-president of academic affairs and clinical research programs at St. Vincent. Defense counsel conceded that Dr. Schlievert is an expert in the field of pediatrics and child abuse.

{¶ 23} Dr. Schlievert explained that approximately 1200 children die per year from abusive head trauma. He testified that he is familiar with articles and studies dealing with short falls leading to head trauma. He described a 1993 article published in the Journal of Pediatrics by Lyons and Oates that studied 207 children under the age of five who were assessed for injuries after experiencing falls in hospitals witnessed by nurses, doctors, or other staff. He said that none of these children died, one broke a collar bone, one suffered brain damage, and one suffered a simple linear skull fracture with no permanent injury. He also summarized a 2008 study by Dr. David Chadwick, published in the Journal of Pediatrics, that had examined a database in California of injury patterns of children under

10.

age five who experienced short falls. That study found that the annual risk of death for infants and toddlers who suffered head injuries from short falls was less than .48 out of a million children per year. He said that where a child presents with severe or fatal head injuries and the history provided is that the child suffered a short fall, this explanation for the child's injuries is not likely to be truthful.

{¶ 24} Dr. Schlievert identified commonalities in the histories provided where young children present with severe or fatal head injuries. The common histories relayed are (1) the caregiver purportedly does not know what happened, (2) the child fell off a piece of furniture, or (3) injury was caused by another small child who is too young to be interviewed or to provide a defense. He explained that another commonality is that the histories provided by the caregivers change depending on who they are talking to and there is often a delay in seeking care for the child.

{¶ 25} According to Dr. Schlievert, the occurrence of abusive head trauma peaks in the age range of two-to-three months. He explained that babies that age often cry or experience colic and this is around the age when initial support from outside family members seems to taper off and parents are on their own for the first time.

{¶ 26} Dr. Schlievert described the usual appearance of a baby who has experienced head trauma. He said that they do not lose all function immediately, but somebody who has witnessed the injury will be able to discern a change in the child. The injury to the brain evolves over several hours. The child may cry at times, open their

11.

eyes, blink, look around the room, or actually feed a little bit as the injury evolves. He referred to a "golden hour"—the first hour after the injury—where if medical care is rendered, some of the injury can actually be reversed, the progression of the injury may be stopped, and the child may improve.

{¶ 27} On cross-examination, Dr. Schlievert agreed that a person who did not cause the injury to the child initially may not notice any signs that the baby has been injured, however, he qualified this by stating that a parent or someone familiar with the child would be able to detect a change in the child. He conceded that in this case, he does not know who caused the trauma to K.H., where it happened, or who was there, but he said that he knows what caused the injury and what the timeframe was. He said that an adult slammed K.H.'s head into something hard, possibly multiple times. He agreed that the "golden hour" was triggered whenever that trauma was inflicted upon K.H. Dr. Schlievert testified that if anyone said they dropped the baby, this was not truthful.

{¶ 28} Dr. Schlievert conceded that he never listened to Hutchinson or Henderson's recorded statements, but he maintained that they presented different accounts of what happened depending on who they were talking to.

{¶ 29} Following Dr. Schlievert's testimony, the court held an in-chambers conference. It observed that Dr. Schlievert testified that he knows what time the injury occurred, but he never told the jury when that was. The court was of the opinion that this was a "vital fact," and the jury should be given this information. The state cautioned the

12.

court that it had purposely avoided any questions specific to K.H., but it submitted that defense counsel "opened [the] door" during cross-examination. The court agreed, and over defense counsel's objection, the trial judge himself asked Dr. Schlievert when the injury to K.H. happened. Dr. Schlievert said that it happened before the family arrived at Albright's house, but after K.H. was in the care of Henderson's mother that afternoon. The judge asked Dr. Schlievert if he recalled the particular times, and Dr. Schlievert responded that Henderson's mother reported that there was a normal feed at 2:45 p.m. and K.H. was in his usual state of health at that time. Dr. Schlievert explained that what concerned him was that while at Albright's house, it was reported that K.H. was not feeding well and was essentially quiet throughout the party. He maintained that this did "not gel with a normal seven-week-old, but it does gel with a brain injured child." On re-cross, Dr. Schlievert conceded that he never spoke with Henderson's mother.

{¶ 30} Dr. Cassin was the last medical professional to testify. He described his background, education, and training, and defense counsel conceded that Dr. Cassin is an expert forensic pathologist. Dr. Cassin explained what an autopsy is and the procedures he uses in performing an autopsy. He testified that before initiating the process, he reviews available medical records.

{¶ 31} Dr. Cassin described the results of his autopsy of K.H. As far as external injuries, Dr. Cassin noted two small abrasions or scrape marks on the left side of the face.

He also observed "artifact," including tape marks, tube marks, and needle punctures attributable to the administration of medical care.

{¶ 32} Internally, Dr. Cassin observed a skull fracture that was directed out from a center point right above K.H.'s ear, emanating in a star pattern across the top of the head, backwards, and forwards. The fractures were pushed apart due to swelling in the brain. Beneath that, Dr. Cassin observed blood on the surface of both sides of the brain, with a larger collection of subdural blood on the right side. He also observed extensive swelling and deformity of the brain caused by several days spent on mechanical ventilation. He characterized the injury as severe because the impact affected the brain, caused a skull fracture that radiated in three directions from a single point, and resulted in bleeding in the brain.

{¶ 33} Dr. Cassin determined that the cause of K.H.'s death was severe brain swelling and pressure exerted downward within the bony box of the brain, eliminating the impulses for his heart to beat, his lungs to operate, and his chemistry to manage. These "functions were destroyed by severe, unrelenting swelling of the brain that could not be arrested by the efforts made during hospitalization."

{¶ 34} On cross-examination, Dr. Cassin conceded that he does not know who caused the injury to K.H.'s skull, where it happened, who witnessed it, or what time it happened.

14.

{¶ 35} The state moved to admit Dr. Cassin's autopsy report with the last sentence of the report deleted.  The last sentence had indicated:  "Because the caregivers did not disclose the nature or location of the injury, and because the explanation offered is unlikely, the manner of death is homicide."  The court admitted the redacted report.

*b.  Evid.R. 702 and 703*

{¶ 36} Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

15.

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 37} "To be admissible, an expert's testimony must be both relevant and reliable." *In re Leah Marie S.*, 6th Dist. Huron No. H-06-037, 2008-Ohio-360, ¶ 19, citing *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It is the role of the trial judge to act as gatekeeper to ensure that evidence which is not relevant or is unreliable does not reach the trier of fact. *Id.*, citing *Daubert* at 591.

{¶ 38} To be relevant, a witness must demonstrate expert qualifications in the relevant subject area superior to the ordinary juror or layperson. *Id.* To be reliable, the witness's opinions must be based upon scientifically valid principles. *Id.* at ¶ 22. In evaluating reliability, the focus is not on whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial. *Id.*, citing *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), paragraph one of the syllabus.

{¶ 39} Evid.R. 703 goes to the foundation for an expert's opinions. It requires that the facts or data upon which an expert bases his or her opinions be those perceived by the expert or admitted in evidence at the hearing.

16.

**{¶ 40}** It is within the broad discretion of the trial court whether to admit or exclude expert testimony. *In re Te.R.*, 6th Dist. Lucas No. L-15-1015, 2015-Ohio-5498, ¶ 16. The trial court's decision will not be reversed absent an abuse of discretion. *Id.* An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### c. Hutchinson and Henderson's Arguments

### 1. Dr. Mohr

**{¶ 41}** With respect to Dr. Mohr, Hutchinson and Henderson claim that not all of the records she created were admitted into evidence. They cite nothing, however, requiring admission of every record she created. We find no abuse of discretion in the trial court's decision allowing Dr. Mohr to testify and in admitting into evidence reports that she created in connection with her treatment of K.H.

### 2. Dr. Cassin

**{¶ 42}** With respect to Dr. Cassin, Hutchinson and Henderson maintain that his opinion of the manner of K.H.'s death was based on his assessment of the caregivers' veracity. As such, they argue, his conclusions invaded the province of the jury, and did not pass the rigors of an Evid.R. 702 or *Daubert* challenge. While they concede that Dr. Cassin did not testify at trial as to the manner of K.H.'s death, and this portion of the autopsy report was redacted for purposes of trial, they insist that an unredacted copy of

17.

the report was provided to Dr. Schlievert, thereby tainting the facts upon which Dr. Schlievert relied in forming his opinions. Hutchinson and Henderson also insist that Dr. Cassin's opinions were based on hearsay, that he lacked personal knowledge of the facts, and that no underlying facts, medical reports, or literature were admitted into evidence at hearing or at trial. They point out that Dr. Cassin conceded that he has no expertise in the field of physics or mechanical engineering, thus any testimony regarding "a numerical distance of a fall" would be speculative.

{¶ 43} The state responds that Dr. Cassin personally performed K.H.'s autopsy and, at trial, he detailed each step of that process which, he testified, was performed in accordance with the procedures accepted by the forensic pathology community. The state urges that the credibility to be afforded Dr. Cassin's conclusions was for the jury to determine.

{¶ 44} We find that Dr. Cassin's testimony satisfied both Evid.R. 702 and 703. Dr. Cassin testified as to his education, training, and experience, and defense counsel stipulated to his expertise. Dr. Cassin personally performed K.H.'s autopsy and he described the procedures he employed in conducting the autopsy. At the *Daubert* hearing held by the court on August 20, 2014, Dr. Cassin made clear that he performed the autopsy and rendered his conclusions in accordance with his training and experience and in a manner consistent with reliable and accepted standards in the field of forensic

18.

pathology. Any opinions Dr. Cassin held concerning K.H.'s manner of death—i.e., homicide—were withheld from the jury, thereby avoiding prejudice to appellants.

{¶ 45} As to Dr. Cassin's lack of expertise in the field of physics or mechanical engineering, Dr. Cassin's trial testimony was limited to his field of expertise. He did not testify at trial concerning "a numerical distance of a fall." In *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 26-28, the appellant argued that "the trial court erred in allowing the state's medical witnesses to testify as experts on the force necessary to cause the injuries suffered by" the child victim. Those medical witnesses, which included a forensic pathologist, testified that the child's injuries were not caused by a fall in a bathtub. *Id.* The Ninth District Court of Appeals rejected appellant's arguments that the medical experts testified outside their areas of expertise. We, too, reject this argument. We find no abuse of discretion in the trial court allowing Dr. Cassin to testify about his findings and we find no error in the court's admission of the redacted autopsy report authored by Dr. Cassin.

### 3. Dr. Schlievert

{¶ 46} Finally, with respect to Dr. Schlievert, Hutchinson and Henderson contend that Dr. Schlievert's opinions about who caused K.H.'s injuries and the caregivers' veracity invaded the province of the jury and did not pass the rigor of Evid.R. 702 or *Daubert*. They also claim that Dr. Schlievert made repeated reference to "the literature," but the state never identified or provided this literature to defense counsel, nor did it

admit the literature into evidence. They say that Dr. Schlievert was permitted to bolster his own credibility "by the unknown credibility of others." They also say that Dr. Schlievert conducted no exams, did not know whether he had seen any pictures, spoke to no one involved, and did not know whether he had been given the complete medical record.

{¶ 47} In addition to this, Hutchinson and Henderson point out that the trial court itself asked Dr. Schlievert what time the injury occurred, and in answering the court's question, Dr. Schlievert based his opinions, in part, on the medical records without specifying which records he relied on. And as with Dr. Cassin, Hutchinson and Henderson argue that Dr. Schlievert lacks expertise in physics and mechanical engineering.

{¶ 48} The state counters that Dr. Schlievert detailed his methodology in diagnosing child abuse, conducted a records review, and rendered a differential diagnosis using acceptable medical methodology.

{¶ 49} The court in *State v. Doss*, 12th Dist. Clermont No. CA2015-03-023, 2015-Ohio-5504, ¶ 25, recognized that "the knowledge involving abusive head trauma has 'long been recognized as the proper subject of expert testimony' and 'the testimony is not novel.'" *Id.*, *quoting State v. Milby*, *12th Dist. Warren No. CA2013-02-014, 2013-Ohio-4331*, ¶ 28. In fact, the *Milby* court concluded that no *Daubert* hearing is required

20.

before allowing such testimony.  We agree, and we find Dr. Schlievert's testimony reliable for purposes of Evid.R. 702.

**{¶ 50}** Turning to Hutchinson and Henderson's challenge to Dr. Schlievert's qualifications, as with Dr. Cassin, we find that Dr. Schlievert's testimony was limited to his field of expertise, and we find that his lack of expertise in the field of physics or mechanical engineering did not disqualify him from testifying.

**{¶ 51}** We now turn to the foundation for Dr. Schlievert's opinions.  We first address his reference to medical literature.  In his report, at the *Daubert* hearing, and again at trial, Dr. Schlievert made clear that in addition to his background, experience, and training, his review of medical literature helped form the basis for his opinions.  The Ohio Supreme Court recognized in *Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, ¶ 53-54, that Ohio amended its hearsay rules in 2006 by adopting Evid.R. 803(18), which permits the admission of statements from learned treatises during the testimony of expert witnesses.  It provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness * * *[:]  To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or

21.

admission of the witness or by other expert testimony or by judicial notice. *If admitted, the statements may be read into evidence but may not be received as exhibits.*

**{¶ 52}** In *Moretz*, the court further observed:

Evid.R. 803(18) replaced former Evid.R. 706, 109 Ohio St.3d LXXXI, which permitted the limited use of learned treatises only for impeachment purposes, and thus prohibited their use during direct examination. Evid.R. 803(18) was adopted in acknowledgement of the fact that in forming their opinions, expert witnesses necessarily rely on "background hearsay * * * in the form of the out-of-court statements of textbook authors, colleagues, and others." 2006 Staff Notes to Evid.R. 803(18). "The rule makes explicit the sources of the expert's opinion, and in doing so both avoids disputes about the level of detail in their testimony and assists the trier of fact in evaluating that testimony." *Id.*, citing *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323.

**{¶ 53}** Hutchinson and Henderson complain that the state did not provide the medical literature relied on by Dr. Schlievert. But they cite nothing requiring the state to do so, and they cite nothing to show that they ever requested these materials. In any event, at the *Daubert* hearing, Dr. Schlievert identified the principal article that he relied

22.

on. At that hearing, defense counsel could have asked what, if any, other literature he relied on in forming his opinions. Defense counsel was also free to cross-examine Dr. Schlievert about the medical literature at trial. We find no abuse of discretion in the trial court allowing Dr. Schlievert to reference medical literature that assisted him in forming his opinions.

{¶ 54} Hutchinson and Henderson also complain that the studies referenced by Dr. Schlievert were not admitted into evidence. Evid.R. 803(18) indicates, however, that learned treatises may not be received as trial exhibits.

{¶ 55} As to Hutchinson and Henderson's claim that Dr. Schlievert conducted no exams, did not know whether he had seen any pictures, spoke to no one involved, and did not know whether he had been given the complete medical record, we observe that on direct examination by the state, Dr. Schlievert provided no opinions specific to K.H.; to the contrary, he spoke generally about abusive head trauma. On cross-examination, however, defense counsel asked questions of Dr. Schlievert that were specific to the case:

Q: This baby here in this case, you do not know who caused the trauma to the brain?

A: No, I can tell you what caused it and the timeframe, but I don't know who specifically inflicted that.

Q: You don't know the perpetrator of that assault?

A: Not of the direct assault.

23.

Q: That answers my question. And you don't know the location where that assault occurred, do you?

A: I do not.

Q: When you speak of the golden hour, that golden hour is triggered by the event that caused that brain fracture, isn't it?

A: Correct.

Q: You don't know what that event was in this case, do you?

A: I do know that.

Q: You didn't observe what that event was?

A: I don't need to observe it. The evidence I reviewed showed me clearly what happened to this child.

Q: This child clearly had a collision with something with its head, correct?

A: Yes. Some adult slammed this kid's head into something hard.

Q: That is right. And maybe even more than once?

A: Possibly.

Q: Maybe three times based on what you saw?

A: It is possible. We know it happened once. More than once is possible.

Q: That event there is what triggered the golden hour, correct?

A: Yes, correct.

Q: This injury could never have been caused even if you dropped the baby, correct, a man your size?

A: I would say that if anybody said they dropped this baby and that is what happened, they were not telling the truth.

Q: You never talked to Beau Hutchinson, did you?

A: I did not.

Q: Did you listen to his tape recorded statement to the good detective here?

A: I did not.

Q: Were you aware that he told her he didn't know what happened in that room?

A: Well, I am aware that many things were said and different times, they differed, based on who he was talking to.

Q: You get that knowledge from the medical records, right?

A: Correct.

{¶ 56} The defense—not the state—asked Dr. Schlievert for his opinions specific to K.H. And defense counsel never asked Dr. Schlievert to specify which medical records he reviewed. To the extent that Dr. Schlievert did not review every piece of

evidence in this case, this goes to the weight of his testimony, and it was a point highlighted by defense counsel on cross-examination. To the extent that Dr. Schlievert may have rendered opinions that were based on facts not admitted into evidence, defense counsel invited any such error when he inquired of Dr. Schlievert's opinions without eliciting the precise foundation for those opinions.[2]

{¶ 57} Hutchinson and Henderson also take issue with the question posed to Dr. Schlievert by the trial court. Before inquiring of the witness, the trial judge called counsel into chambers and told them that because Dr. Schlievert indicated that he knew what time the injury occurred, he intended to ask this question of Dr. Schlievert. The trial judge explained:

> I think the jury ought to know what that is. I don't know whose favor it goes to, defense or prosecution, but I think that is a vital fact. If he can say this happened at 6:08, fine. If he can say it happened between noon and nine, fine, but I think the jury ought to be able to know that.

{¶ 58} Counsel for the state explained to the court that she had conducted her direct examination so as to avoid questions specific to K.H., but she noted that defense counsel had opened the door during cross-examination. The court agreed. The trial court

---

[2] Dr. Schlievert's August 13, 2012 report indicates that he reviewed the Magruder Hospital ER records from 3/9/12-3/10/12, medical records and xrays and cat scans from St. Vincent Hospital dated 3/10/12, child protection team consultation reports from U of M dated 3/12/12 and 3/14/12, and the autopsy report. These records were all admitted into evidence at trial.

then asked Dr. Schlievert when the injury happened. Dr. Schlievert responded that based on his review, it happened before his arrival at Albright's, but after being in the care of Henderson's mother. He based this opinion on medical records indicating (1) that Henderson's mother fed K.H. at 2:45 p.m. and he was in his "usual state of health," (2) that K.H. did not feed well and was quiet throughout the whole evening—behavior that he believed to be atypical of a normal seven-week-old infant, but typical of a brain injured child.

{¶ 59} Under Evid.R. 614(B), a trial judge may interrogate a witness "as long as the questions are relevant and do not suggest a bias for one side or the other." *Metro. Life Ins. Co. v. Tomchik*, 134 Ohio App.3d 765, 794, 732 N.E.2d 430 (7th Dist.1999), citing *State v. Blankenship*, 102 Ohio App.3d 534, 548, 657 N.E.2d 559 (12th Dist.1995). "Absent a showing of bias, prejudice, or prodding of the witness to elicit partisan testimony, it is presumed that the trial court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth." *Id.* A trial court's interrogation of a witness will not be deemed "partial" "merely because the evidence elicited during the questioning is potentially damaging to the defendant." *Id.*

Here, we find that the trial court did not exhibit any bias in inquiring of Dr. Schlievert. The court's questioning was prompted by questions posed to him by defense counsel. Furthermore, we find that the facts forming the basis for Dr. Schlievert's

27.

opinion as to the time of the injury were contained in the record. Those facts were noted in Dr. Mohr's report, which had previously been admitted into evidence.

{¶ 60} Finally, we note that while Dr. Schlievert's report was admitted as an exhibit at the *Daubert* hearing, it was not offered or admitted into evidence at trial. Thus, much of what Hutchinson and Henderson complain about in challenging Dr. Schlievert's testimony was never presented to the jury.

{¶ 61} We find no abuse of discretion in the trial court's decision allowing Dr. Schlievert's testimony, and we find Hutchinson and Henderson's first assignment of error not well-taken.

### 2. Motion for Appropriation of Funds for a Defense Expert

{¶ 62} In their second assignment of error, Hutchinson and Henderson argue that the trial court erred in denying their request for funds to hire a defense expert. They maintain that they located a forensic pathologist from Minnesota, John Plunkett, M.D., who had written extensively on short falls, yet the trial court refused to authorize funds to hire an expert, thereby severely limiting their defense.

{¶ 63} The state counters that Hutchinson and Henderson had a household income of $60,000 per year, thus they were not indigent and were not entitled to an expert hired at the state's expense. The state also argues that Hutchinson and Henderson failed to meet their burden to establish the need for expert testimony. It contends that Hutchinson and Henderson made only a generic assertion that expert assistance was necessary.

28.

{¶ 64} An indigent criminal defendant is entitled to an expert witness at the state's expense only where the trial court finds that the defendant has made a particularized showing of a reasonable probability that the requested expert would aid in his defense, and that denial of the requested expert assistance would result in an unfair trial. *State v. Mason*, *82 Ohio St.3d 144*, *150*, 694 N.E.2d 932 (1998). This requires a defendant to present sufficient facts demonstrating the need for expert assistance. *State v. Peterson*, 7th Dist. Columbiana No. 06 CO 26, 2007-Ohio-4980, ¶ 65. In considering the defendant's request, the trial court must assess "the value of the expert assistance to the defendant's proper representation" and "the availability of alternative devices that would fulfill the same functions as the expert assistance sought." *Id.* at ¶ 64, citing *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph four of the syllabus. Ultimately, it is within the trial court's broad discretion whether to appoint an expert, and we will not reverse the trial court's decision absent an abuse of that discretion. *Id.* at ¶ 63.

{¶ 65} The trial court denied Hutchinson and Henderson's motion because (1) their household income exceeded the federal poverty guidelines by 187.5 percent, and (2) they failed to show how expert assistance would have provided more than a mere possibility of assistance.

{¶ 66} Ohio Adm.Code 120-1-03(E)(3) provides that "[a] defendant who retains counsel but does not have sufficient funds to pay for experts, transcripts, and other related

29.

expenses should be declared indigent for those purposes." *See also State v. Mansfield*, 2d Dist. Clark No. 2015-CA-72, 2016-Ohio-8189, ¶ 10 ("A defendant who has retained private counsel may still be declared indigent for purposes of expert assistance."). Under Ohio Adm.Code 120-1-03(C)(3) and (4), when determining an applicant's indigence, the number and ages of persons the applicant has a legal duty to support must be considered, as must the applicant's basic living expenses. "Basic living expenses" include, "housing rent and/or mortgage payments, child support actually paid, child care, health insurance premiums, medical and dental expenses, costs of caring for an infirm family member, employment transportation costs, costs of fuel, food, telephone, utilities, taxes withheld, credit card and other loan payments, and other similar basic costs of living." Ohio Adm.Code 120-1-03(C)(4). Moreover, under Ohio Adm.Code 120-1-03(C)(1), only the applicant's income may be considered, "unless other persons in the applicant's household have a legal duty to support the applicant."

{¶ 67} In July of 2014, when Henderson initially requested funds for an expert, she reported income of $400 per month and expenses of $586. In 2014, the federal poverty guideline for a household of one was $11,670. (https://aspe.hhs.gov/2014-poverty-guidelines, accessed January 9, 2017). Henderson's income was $4,800 at that time. While Hutchinson is listed as living in her household, he had no obligation to support her. Thus, it was not appropriate to consider his income in considering her eligibility for financial assistance. Henderson was clearly at or below 187.5% of the federal poverty

30.

guidelines for purposes of Ohio Adm.Code 120-1-03. The trial court abused its discretion in holding otherwise.

{¶ 68} Having found that Henderson was indigent, we turn to the second part of the trial court's holding: that Henderson failed to show how expert assistance would have provided more than a mere possibility of assistance.

{¶ 69} After filing their original motion for appropriation of funds for a defense expert, Hutchinson and Henderson filed a "supplement re: motion for funding," in which they represented to the court that Dr. Plunkett had retired. In that supplement, they identified a new potential expert, David Posey, M.D., a forensic pathologist in California. The supplemental motion provided information that was not included in their first motion—e.g., the doctor's hourly rate, a timeline for review of the case, and an approximation of the number of hours it would take to review the case, prepare a report, and prepare for and attend trial. The preliminary evaluation of the case alone was estimated to cost $12,000. Dr. Posey's curriculum vitae was attached to this motion. The CV indicates that he once spoke at a 2008 conference on child abuse defense, but beyond that, the supplemental motion fails to articulate how Dr. Posey may have assisted in Henderson's defense. In short, the supplemental motion failed to make a particularized showing of a reasonable probability that the requested expert would aid in Henderson's defense.

31.

{¶ 70} Turning to Hutchinson, he reported income in 2014 of $4,200 per month and expenses of $1,960. Subtracting out those expenses, his income exceeded the federal poverty guideline by more than 187.5%. In 2015, however, Hutchinson indicated that his income had fallen to $3,300 per month, and his expenses increased to $2,160. He did not explain why his income had decreased or why his expenses had increased so significantly. But we find that we need not determine whether he was indigent for purposes of obtaining an expert at the state's expense because, like Henderson, he failed in his supplemental motion to make a particularized showing of a reasonable probability that the requested expert would aid in his defense.

{¶ 71} We, therefore, find no abuse of discretion in the court's decision, and we find Hutchinson and Henderson's second assignment of error not well-taken.

### 3. Motion for Acquittal

{¶ 72} In their third assignment of error, Hutchinson and Henderson challenge the trial court's denial of their motion for acquittal under Crim.R. 29. They claim that the state did not present sufficient evidence to support their child endangering convictions because it failed to prove when the injury to K.H. happened, where it happened, who was present, and who was not present. They also claim that child endangering is an affirmative act whereby a substantial risk is created, yet the state presented no evidence that they knew that something happened, permitted something to happen, violated any duty, or engaged in any action or inaction that caused or exacerbated any harm to K.H.

32.

They also contend that there was no evidence that Hutchinson was the guardian or custodian of the child.

{¶ 73} The state counters that it presented evidence that Henderson was K.H.'s parent and Hutchinson had custody or control or was a person in loco parentis of K.H. It contends that K.H. suffered extensive head trauma while in Hutchinson and Henderson's care and that they intentionally delayed in seeking medical treatment despite recognizing that the baby was not breathing properly. The state insists that this act alone created a substantial risk to the health and safety of the child, but it further maintains that they lied about the cause of K.H.'s injuries and told inconsistent versions of the events leading up to the time they brought the baby to the hospital. This, the state claims, demonstrates that Hutchinson and Henderson knew they violated a duty to K.H. and were trying to cover up the truth.

{¶ 74} We review a Crim.R. 29 motion for acquittal under the same standard used to review a sufficiency of the evidence claim. *State v. Hollstein*, 6th Dist. Lucas No. L-08-1184, 2009-Ohio-4771, ¶ 28. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d

33.

89, 113, 684 N.E.2d 668 (1997).  In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses.  *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 75} To prove third-degree felony child endangering under R.C. 2919.22(A), the state must prove beyond a reasonable doubt (1) that the defendant was the parent, guardian, custodian, person having custody or control, or person in loco parentis of the subject child; (2) that he recklessly created a substantial risk to the health or safety of the child by violating a duty of protection, care or support; and (3) that the defendant's conduct resulted in serious physical harm to the child.  (Citations omitted.)  *State v. Stewart*, 5th Dist. Stark No. 2007-CA-00059, 2007-Ohio-6118, ¶ 51.  Under R.C. 2901.22(C), "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."  And under R.C. 2901.01(H), a "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."

{¶ 76} We start by addressing the first element.  While Hutchinson argues that he was not K.H.'s parent or guardian, he does not address the other statuses under which a person may be liable for a violation of R.C. 2919.22(A):  a "person having custody or control" or a "person in loco parentis" of the child.

34.

**{¶ 77}** The Ohio Supreme Court has explained that "the term 'in loco parentis' means 'charged, factitiously, with a parent's rights, duties, and responsibilities.' A person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding." (Citations omitted.) *Glancy v. Spradley*, 12th Dist. Butler No. CA2012-02-024, 2012-Ohio-4224, ¶ 7. A person will be deemed in loco parentis where he or she assumes the same duties as a guardian or custodian. *Id.* at ¶ 11.

**{¶ 78}** Here, the state presented evidence that while Hutchinson did not live with Henderson, he stayed with her five out of seven nights a week. Henderson said during her interview with Detective Amy Gloor that she had been with Hutchinson throughout her pregnancy with K.H. And Henderson's mom testified that Hutchinson took care of the baby, changed his diaper, fed him, bathed him, and took a fatherly role. We also observe that Hutchinson rode with K.H. when he was life-flighted to St. Vincent Hospital. We find that this evidence was sufficient to satisfy the first element of the offense.

**{¶ 79}** We next turn to whether the state offered evidence that Hutchinson and Henderson recklessly created a substantial risk to K.H.'s health or safety by violating a duty of protection, care or support. In order to establish this element of the offense, the state need not prove that the defendants caused the initial injury to K.H. A defendant may violate R.C. 2919.22(A) by failing to seek medical attention for a child. *Stewart*, 5th Dist. Stark No. 2007-CA-00059, 2007-Ohio-6118, ¶ 56. *See also State v. Legg*, 89 Ohio

35.

App.3d 184, 187, 623 N.E.2d 1263 (9th Dist.1993). To rise to the level of third-degree child endangering, the violation of duty must have resulted in serious physical harm.

{¶ 80} The state contends that K.H. suffered extensive head trauma while in Hutchinson and Henderson's care and that they delayed medical care despite recognizing that the baby was struggling to breathe. It presented evidence in support of this contention. Specifically, the state relayed two versions of the events. One was the version believed by its experts—that K.H. was injured after Hutchinson and Henderson returned from running errands that afternoon, but before the family arrived at the party—yet, no medical treatment was sought for his injuries until almost midnight. The second was the version advanced by Hutchinson and Henderson—that K.H. was injured when he was dropped by a toddler at the party. Despite observing that K.H. was gasping for air, they (1) did not call for an ambulance, and (2) made a detour to pick up Henderson's grandmother instead of driving immediately to the hospital, thereby delaying treatment to a baby that was obviously struggling to breathe. Dr. Mohr testified that time was of the essence and K.H. sustained a worsening injury from the failure to seek immediate medical care. We conclude that these facts satisfy the second and third elements of the offense and are sufficient to support a conviction under R.C. 2919.22(A).

{¶ 81} We find Hutchinson and Henderson's third assignment of error not well-taken.

36.

### 4. Prosecutor's Comments About Credibility of Witnesses

{¶ 82} In their fourth assignment of error, Hutchinson and Henderson claim that they were prejudiced because the court allowed the prosecutor to make repeated statements concerning her assessment of the witnesses' credibility. They claim that the statements were pervasive and the trial court's failure to intervene sua sponte amounted to plain error.

{¶ 83} The state argues that both the prosecution and defense have wide latitude in summation and a prosecutor may state his or her opinion if it is based on the evidence presented at trial. It maintains that the state's comments during closing were not improper because evidence elicited from the witnesses established that Hutchinson and Henderson were not truthful during the investigation into K.H.'s death and gave inconsistent versions of events, both before and after trial. The state insists that "the facts presented at trial showed that both Appellants had, in fact, lied multiple times during the investigation and during trial."

{¶ 84} Because there was no objection at trial to the prosecutor's statements, we review this assignment of error under a plain-error analysis. The plain-error doctrine represents an exception to the usual rule that errors must first be presented to the trial court before they can be raised on appeal. It permits an appellate court to review an alleged error where such action is necessary to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). In order to prevail under a

37.

plain-error standard, an appellant must demonstrate that there was an obvious error in the proceedings and, but for the error, the outcome clearly would have been otherwise. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62.

{¶ 85} Hutchinson and Henderson challenge statements made by the state in its opening, indicating that Hutchinson and Henderson lied and needed to be held responsible, and they challenge numerous statements made at closing indicating that they had lied or were liars.

{¶ 86} As the state argues, counsel generally is entitled to considerable latitude in opening statement and closing argument. *State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). While, generally, it is improper for an attorney to express his or her personal opinion as to the credibility of a witness, "it is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 197; *State v. Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, ¶ 19 (2d Dist.). But "[a] prosecutor needs to be very careful when he or she uses the term 'lies' or 'liar' in reference to the defendant or the defendant's statements." *State v. McDade*, 11th Dist. Lake No. 96-L-197, 1998 Ohio App. LEXIS 2927, *12 (June 26, 1998).

38.

**{¶ 87}** Here, in several instances, it was arguably improper for the state to characterize Hutchinson and Henderson as "liars" and their statements as "lies." But viewing the closing argument as a whole, as we must do, we cannot conclude that the outcome of the trial clearly would have been different were it not for the prosecutor's improper comments. *See State v. Carpenter*, 116 Ohio App.3d 615, 623, 688 N.E.2d 1090 (2d Dist.1996) (explaining that in reviewing remarks made by a prosecutor during summation, the closing argument must be reviewed in its entirety).

**{¶ 88}** Accordingly, we find Hutchinson and Henderson's fourth assignment of error not well-taken.

### 5. Maximum Sentence

**{¶ 89}** In their fifth assignment of error, Hutchinson and Henderson claim that the trial court erred in imposing the maximum prison sentence of 36 months. They contend that the court was not required to impose a prison sentence, recidivism is low in this case, and no one "still knows when anything happened, where it happened, who was present, and who was not present[.]"

**{¶ 90}** The state counters that the sentences imposed by the court fall within the permitted statutory range, the court considered R.C. 2929.11 and 2929.12, and the court reviewed all materials provided to it in determining Hutchinson and Henderson's sentences. The court concluded that they "did not adequately care for [K.H.] once [they] knew of his injuries, whenever that was."

39.

{¶ 91} We review felony sentences under R.C. 2953.08(G)(2). Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or otherwise modify a sentence or may vacate the sentence and remand the matter to the sentencing court for resentencing if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶ 92} Here, the provisions specified in R.C. 2953.08(G)(2)(a) are inapplicable. We, therefore, turn to R.C. 2953.08(G)(2)(b). The Supreme Court of Ohio in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 18, held that a sentence is not clearly and convincingly contrary to law where the trial court has considered the purposes and principles of sentencing under R.C. 2929.11 and the seriousness and recidivism factors under R.C. 2929.12, properly applied postrelease control, and imposed a sentence within the statutory range.

{¶ 93} Under R.C. 2929.14(A)(4), for a felony of the third degree, the court shall impose a prison term of nine, 12, 18, 24, 30, or 36 months. Hutchinson and Henderson's 36-month sentence is within the statutory range. The record also makes clear that the trial court considered the principles and purposes of sentencing under R.C. 2929.11 and the

40.

seriousness and recidivism factors under R.C. 2929.12. We find no error in the sentence imposed by the trial court.

**{¶ 94}** We, therefore, find Hutchinson and Henderson's fifth assignment of error not well-taken.

### C. Conclusion

**{¶ 95}** We find Hutchinson and Henderson's five assignments of error not well-taken, and we affirm the November 12, 2015 judgment of the Ottawa County Court of Common Pleas. Hutchinson and Henderson are responsible for the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.          _____
                              JUDGE
Stephen A. Yarbrough, J.

James D. Jensen, P.J.          _____
CONCUR.                        JUDGE

                              _____
                              JUDGE