OPINION *Page 2 
{¶ 1} Defendant-appellant, Laura Gault-Stewart, appeals her conviction on one count of child endangerment in violation of R.C. § 2919.22(A). Because the indictment contained an allegation of serious physical harm, the charge was elevated to a felony of the third degree. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND THE CASE {¶ 2} Logan Gault, age 3, is the only son of the appellant, Laura Gault-Stewart. Logan lived with his mother and maternal grandmother, Jeanne Gault, from his birth until around February 23, 2006. At the age of ten months, he was diagnosed with a rare genetic disorder known as Trisomy 18q. Instead of two chromosomes at the 18th pair, Logan has three. Children born with Trisomy 18q are rare. This condition, which is similar to Down Syndrome, can cause mental retardation and even shorten a person's life expectancy. Logan did not walk until he was three years old and continues to have trouble walking, including walking into objects.
 {¶ 3} While living with his mother and grandmother, Logan attended Eastgate Elementary School. While Logan had "global deficits," he was generally a happy child who was walking and learning social and language skills. A pediatrician saw Logan regularly; Asif Younus, M.D. Dr. Younus saw no signs of abuse during his care of Logan. Appellant's then boyfriend Jamie Stewart moved into the home in February 2006. During the last week in February 2006, Gault-Stewart, Jamie Stewart and Logan decided to move out of her mother's apartment and in with the parents of her boyfriend. (2T. at 374). *Page 3 
 {¶ 4} In the first week of February 2006, Logan had an ear infection and flu symptoms. The appellant took him to the doctor. On Friday, February 24, 2006, Gault-Stewart, accompanied by her boyfriend, took Logan to see Dr. Younus. The purpose of this visit was to discuss Logan's behavior, "because he was crying and he was fussy and he was angry." Dr. Younus examined the child and saw nothing out of the ordinary in Logan's condition and nothing that would indicate the need for immediate hospitalization. Dr. Younus suggested that Gault-Stewart seek a psychiatric consultation.
 {¶ 5} On Saturday, February 25, 2006, at about 3:30 pm, Gault-Stewart left the care of her son, Logan, with Mr. Stewart and left for her job doing in-home health care. About 7:30 p.m., she received a text message on her cell phone from her boyfriend. The text message said, "Logan was acting funny. Gault-Stewart asked the family if she could leave work early and arrived home around 8:15 pm. Logan was sleeping when she arrived. Gault-Stewart got her son up and tried to feed him. He ate a little bit of food and drank a little juice. However, he then got sick and pointed to his bed. Gault-Stewart laid him down.
 {¶ 6} Gault-Stewart learned from Jamie Stewart that he had been packing and laid Logan on a couch to nap putting pillows on the floor. When Stewart checked on him, he discovered he had fallen to the floor onto the pillows. When asked if he was ok, Logan responded "okay." A short time later Logan began acting funny, throwing up and not keeping things down. The food he had eaten earlier in the day came out "whole." He vomited on Stewart. Stewart then text messaged Gault-Stewart. *Page 4 
 {¶ 7} The next day, Sunday, February 26, 2006, Gault-Stewart was home all day and with Logan and he "acted pretty much the same."
 {¶ 8} "[GAULT] We took him to the potty, tried to feed him; and he got sick after we fed him. I gave him something to drink, he got sick.
 {¶ 9} "I went to lay down, he laid down with me. We woke up — well, I woke up. I didn't really sleep because I was too worried about what was going to happen with him.
 {¶ 10} "I woke up. He got up, went to the potty because he didn't really sleep either.
 {¶ 11} "* * *
 {¶ 12} ". . . . I was trying to talk to him like I am looking at you, and he acted like he was looking at me; but it would look like he was looking at Jamie." (2T. at 428-429).
 {¶ 13} Gault-Stewart gave Logan Children's Tylenol and Pepto Bismol. Logan kept throwing up, was not active and wanted to lie down. The fever continued.
 {¶ 14} On Monday, February 27, 2006, Logan did not go to school and continued to be lethargic with a decreased appetite. His fever kept spiking, going up and coming down. He started acting "more gazey, drifting off, things like that — acting like a vegetable." (1T. at 324).
 {¶ 15} On Tuesday, February 28, 2007, Logan woke up and ate a small amount of cereal. Gault-Stewart and Jamie Stewart took him with them to run errands. Logan continued to be "sleepy" as they went to Lowe's and to Sears to look for a washer and dryer. At Sears, Logan was walking and Jamie Stewart was holding his hand. Evidently, Stewart let go of his hand as, according to Gault-Stewart, when they walked outside, Logan almost ran into the first pillar. Stewart told Logan to watch where he was going, *Page 5 
"you can't run into things." Then Jamie Stewart looked up for just a minute and Logan "walked right into the pillar." Gault-Stewart did not see him hit the pillar, but she heard it.
 {¶ 16} Gault-Stewart then took Logan and Jamie Stewart home. Gault-Stewart left Logan with Jamie Stewart while she went out to deliver copies of her resume to potential employers. On her way, she received another text message from Jamie Stewart saying that Logan was acting funny.
 {¶ 17} When she arrived home, she found Logan with his hands clenched and his arms crossed. Logan was "wailing his arms, saying Nana, Nana, no, Nana."
 {¶ 18} Gault-Stewart then took her son by car to Aultman Hospital. After observing his injuries in the emergency room and performing a CAT scan, Logan was immediately transported by helicopter to Rainbow Babies and Children's Hospital in Cleveland, Ohio.
 {¶ 19} Logan Gault was on life support. A comatose state was induced and he was intubated. A feeding tube was inserted to provide nutrition. He was not responsive to any light or touch.
 {¶ 20} Logan presented with three life-threatening conditions. First, he had a left-sided interhemispheric hemorrhage, meaning that he had blood in his brain. Second, he had an acute ischemic change, meaning that brain tissue had died. Third, he had focal brain edema, meaning a swelling of the brain accompanied by a subarachnoid hemorrhage. Dr. Lolita McDavid, the medical director of child advocacy and protection at Rainbow Babies and Children's Hospital, using illustrations from the CAT scan, explained: *Page 6 
 {¶ 21} "[DR. McDAVID] . . . Your brain is in two hemispheres, okay. So what you see here, this slit here, this is cerebral spinal fluid in here. You don't see it over here. That's because it is so swollen over here that it is pushing over, okay.
 {¶ 22} "Then you are seeing blood here in between that you shouldn't be seeing, shouldn't see this blood down here. But his brain should look like mirror images of itself." (1T. at 211-212).
 {¶ 23} Dr. McDavid opined that the injuries she observed — blood on the brain and acute ischemic change — are caused when a person is choked or a hand is put over the mouth. The brain is not getting enough oxygen and the red brain cells die. Dr. McDavid further opined that the focal edema and subarachnoid hemorrhage could have been caused by two different mechanisms either a shaking injury that breaks the blood vessels. Dr. McDavid explained, "the reason they are broken is . . . because the brain is on a stalk called your spinal cord. So if I shake you, it actually . . . breaks the little blood vessels, and you get a subdural bleed." (1T. at 213-214). Alternatively, a blow to the head can cause a subarachnoid hemorrhage:
 {¶ 24} "[DR. McDAVID] A subarachnoid bleed is like when a baseball player gets hit in the head by a ball that comes 90 miles an hour, they are kind of stunned. They go into a dugout and they drop dead two hours later. That's because the blood tends to be more arterial than venal.
 {¶ 25} "Venal will tend to stop bleeding on its own. Often the same type of injury that a boxer had, you know, they stop the fight, he goes into the dressing room and he drops dead. It is usually a subarachnoid bleed." (1T. at 214). *Page 7 
 {¶ 26} In all, Logan had a subarachnoid bleed caused by shaking or a severe blow to the head and loss of blood flow to the brain caused by a choking or someone putting a hand over his mouth cutting off oxygen to the brain.
 {¶ 27} "[DR. McDAVID] Shaking, striking, impact. That's for the subdural and subarachnoid bleeds. For the ischemic brain changes, it is lack of oxygen to the brain. So someone putting a hand over his mouth or putting a pillow on his face or putting their hands around his neck, that would decrease blood flow to the brain itself." (1T. at 239).
 {¶ 28} Logan also had a non-life threatening bruise on his forehead over his right eye and another one on his left temple that went into his hairline.
 {¶ 29} Dr. McDavid opined that the acute ischemia, dead brain cells caused by lack of oxygen, occurred between 8 to 12 hours and no more than three days before Logan was hospitalized and the tests were taken on March 1, 2006 at 5:00 am. The subarachnoid hemorrhaging, bleeding in the brain, caused by a blow or shaking, occurred between three and five days before Logan was hospitalized. Dr. McDavid further opined that Logan's injuries did not arise from falling off a couch onto floor pillows. The symptoms appeared before any allegations that Logan's acute injuries were caused by walking into a cement pole.
 {¶ 30} Dr. McDavid further opined that the combination of injuries in Logan were uncommon in one child and occurred as the result of non-accidental trauma.
 {¶ 31} After Logan was life-flighted to Rainbow Hospital, Gary Frascone former captain of the Navarre Police Department and a social worker went to Cleveland to interview Gault-Stewart, Jamie Stewart and Logan's paternal grandmother. *Page 8 
 {¶ 32} After interviewing Gault-Stewart and her boyfriend, Jamie Stewart, and learning that they were the only persons who were alone with him the preceding five days, the investigators informed the couple that Jamie Stewart could have no further contact with Logan in the hospital. Gault-Stewart became irate saying, "well, who is going to take care of me" and threw papers at the social worker. Later, she barred any visitors from seeing Logan in the hospital.
 {¶ 33} When Logan's paternal grandparents went to visit Logan in the hospital, Gault-Stewart told them she was going to marry Jamie Stewart the next day. When asked, why now, with your son in intensive care, Gault-Stewart responded that they were going to get married earlier so "they would not have to testify against each other."
 {¶ 34} Gault-Stewart married Jamie Stewart on March 6, 2006 while her son, Logan, was in the intensive care unit of Rainbow Babies and Children's Hospital.
 {¶ 35} Appellant, Laura Gault-Stewart, was indicted on one count of child endangerment a violation of R.C. § 2919.22(A). Because the indictment contained an allegation of serious physical harm, the charge was elevated to a felony of the third degree. The indictment also contained child-endangering charges against Gault's boyfriend, Jamie Stewart. The charges against Gault-Stewart alleged that she recklessly created a substantial risk to the health or safety of her child, Logan Gault, when she violated her duty of care, protection or support and caused serious physical harm.
 {¶ 36} Gault-Stewart pleaded not guilty and a series of hearings followed over whether Jeff Jakmides could represent both of the Stewarts. Finally, the Stewarts opted for a joint trial with separate counsel. *Page 9 
 {¶ 37} Gault-Stewart and her husband testified in their case in chief and presented the videotape deposition of Asif Younus, M.D., the child's treating pediatrician.
 {¶ 38} Both the appellant and her husband were found guilty of Endangering Children pursuant to R.C. 2919.22(A)[1]. The Jury further found that the violation R.C. 2919.22(A) resulted in serious physical harm to the victim in violation of R.C. 2919.22 (E) (1) (c). Jamie Stewart, however, was found not guilty of Child Endangering based upon an allegation of abuse. On January 16, 2007, the appellant filed a Motion for Acquittal pursuant to Criminal Rule 29(C) arguing the State did not prove that appellant's delay in seeking medical treatment for her son caused serious physical harm. The Court held a hearing on this Motion on February 5, 2007, and denied the Motion on February 13, 2007. Also on February 13, 2007, the Court held a Sentencing Hearing at which the appellant was ordered to serve three years in prison.
 {¶ 39} Appellant has timely appealed raising as her sole assignment of error:
 {¶ 40} "I. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 I. {¶ 41} In her sole assignment of error appellant maintains that her conviction is against the sufficiency and the manifest weight of the evidence. We disagree.
 {¶ 42} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley *Page 10 
(Mar. 15, 2000), 9th Dist. No. 19600, at 3. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenges questions whether the State has met its burden of persuasion." State v.Thompkins (1997), 78 Ohio St.3d 380, 390.
 {¶ 43} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by State constitutional amendment on other grounds inState v. Smith (1997), 80 Ohio St.3d 89.
 {¶ 44} Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks, supra. This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Thompkins, 78 Ohio St.3d at 386.
 {¶ 45} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. State v. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting *Page 11 
testimony. Id. at 388. An appellate court must make every reasonable presumption in favor of the judgment and Findings of Fact of the trial court. Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact."State v. demons (1998), 82 Ohio St.3d 438, 444, citing State v.Jenks, 61 Ohio St.3d at 273. Therefore, this Court's "discretionary power * ** should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin
(1983), 20 Ohio App.3d 172, 175; See, also, Otten, 33 Ohio App.3d at 340.
 {¶ 46} Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
 {¶ 47} In State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541, the Ohio Supreme Court held "[t]o reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." Id., paragraph three of the syllabus. However, to "reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id., paragraph four of the syllabus;State v. Miller (2002), 96 Ohio St.3d 384, 2002-Ohio-4931 at ¶ 38,775 N.E.2d 498. *Page 12 
 {¶ 48} In the present case, appellant was charged with and convicted of child endangering in violation of R.C. 2919.22(A), resulting in serious physical harm, a third degree felony.
 {¶ 49} R.C. 2919.22(A) provides in relevant part:
 {¶ 50} "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support . . ."
 {¶ 51} R.C. 2919.22(A) is aimed at preventing acts of omission or neglect. See, e.g., State v. Sammons (1979), 58 Ohio St.2d 460, appeal dismissed (1980), 444 U.S. 1008; State v. Kamel (1984),12 Ohio St.3d 306, 308; Committee comment to R.C. 2919.22. Where a defendant is charged with a violation of R.C. 2919.22(A), resulting in serious physical harm, the prosecution must prove that the defendant: (1) was the parent, guardian, custodian, person having custody or control, or person in loco parentis of the subject child; (2) recklessly created a substantial risk to the health or safety of the child; (3) created that risk by violating a duty of protection, care or support; (4) and that the defendant's conduct resulted in serious physical harm to the child.State v. Barton (1991), 71 Ohio App.3d 455, 463, motion for leave to appeal overruled (1991), 61 Ohio St.3d 1427; State v. Newman (Aug. 18, 1995), Ross App. No. 94 CA 2079; State v. Elliott (June 22, 1995), Franklin App. Nos. 94APA08-1274 and 94APA08-1275; State v. Kirk (Mar. 24, 1994), Franklin App. 93AP-726. *Page 13 
 {¶ 52} The parties do not dispute that appellant is Logan's mother. Thus, the evidence offers a substantial basis upon which the jury could reasonably conclude that the first element of R.C. 2919.22(A) was satisfied beyond a reasonable doubt.
 {¶ 53} Although not stated in R.C. 2919.22, recklessness is the culpable mental state for the crime of child endangering. State v.O'Brien (1987), 30 Ohio St.3d 122, 508 N.E.2d 144; State v. Conley, Perry App. No. 03-CA-18, 2005-Ohio-3257 at ¶ 20. Recklessness is defined in R.C. 2901.22(C), which states:
 {¶ 54} "(C) A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."
 {¶ 55} To satisfy the second element of a violation of R.C.2919.22(A), recklessness must create a "substantial risk" to the health and safety of the child. A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result or circumstance may occur." R.C. 2901.01(H). See, also,Kamel, supra, at 308; State v. Newman, supra.
 {¶ 56} The fact-finder need not have found that appellant or her husband caused the injuries to Logan. State v. Traster (Oct. 23, 1996), Summit App. No. 17548. The state asserts that appellant violated R.C.2919.22(A) by failing to promptly seek medical attention for Logan. InState v. Kamel (1984), 12 Ohio St.3d 306, 309-310, the Court noted, "no steps were taken by the doctor [Kamel] to secure medical attention for his son or to prevent any further injury to him. Certainly, this was not consistent with his *Page 14 
parental duty of care." Thus, as the father in Kamel, appellant may be convicted of violating R.C. 2919.22(A) by failing to seek medical attention for her son. State v. Evans (1994), 93 Ohio App.3d 121, 126,637 N.E.2d 969,972; State v. Legg (1993), 89 Ohio App.3d 184,623 N.E.2d 1263; State v. Sandefur (Aug. 11, 1993), Summit App. No. 15787.
 {¶ 57} The jury could have found the third element of R.C. 2919.22(A) satisfied. As a parent, appellant clearly had a duty to care for and protect Logan. According to the testimony adduced below, Logan's injuries occurred between 8 to 12 hours and no more than 3 to 5 days before Logan was hospitalized. (1T. at 232-233). Appellant was caring for and aware of Logan's condition during this time.
 {¶ 58} To satisfy the fourth element of a violation of R.C. 2919.22(A) appellant's conduct must have resulted in serious physical harm to Logan. What constitutes "serious physical harm" is defined by R.C.2901.01(E), which reads, in pertinent part:
 {¶ 59} "(E) Serious physical harm to persons' means any of the following:
 {¶ 60} "(1) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 {¶ 61} "(2) Any physical harm which carries a substantial risk of death;
 {¶ 62} "(3) Any physical harm which involves some permanent incapacity, whether partial or total, or which involves some temporary, substantial incapacity.
 {¶ 63} "(4) Any physical harm which involves some permanent disfigurement, or which involves some temporary, serious disfigurement; *Page 15 
 {¶ 64} "(5) Any physical harm which involves acute pain of such duration as to result in substantial suffering, or which involves any degree of prolonged or intractable pain."
 {¶ 65} R.C. 2901.01(C) defines "physical harm" as follows: "Physical harm to persons means any injury, illness, or other physiological impairment, regardless of its gravity or duration."
 {¶ 66} Appellant claims that there was only evidence that Logan had displayed flu-like symptoms, including vomiting and a high temperature, and that knowledge of these symptoms did not place appellant on notice of the severity of Logan's injury. Appellant testified that Logan had an ear infection eleven days prior to February 24, 2006. (2T. at 424). Appellant claims on or about February 24, 2006 when she took him to see his pediatrician he additionally had symptoms of ear infection or the flu. (2T. at 431; 445). Appellant thought Logan was getting "resick" or that the injuries were caused by Logan's walking into a concrete pillar. (2T. at 424; 431; 442; 445). We disagree.
 {¶ 67} The testimony at trial clearly established that the injuries to Logan were the result of "nonaccidential trauma." (1T. at 254; 263). Dr. McDavid testified that the blood on Logan's brain and the acute ischemic change are caused by the brain not getting enough oxygen, such as when the individual is choked, or has a hand or object placed over his or her mouth. (1T. at 209-210). The medical records admitted as State's Exhibit 2 also indicate retinal hemorrhages were present. Dr. McDavid further opined that the focal edema and subrachnoid hemorrhage could have been caused by two different mechanisms — either a shaking injury, or a blow to the head. (1T. at 213-216). The medical testimony further ruled out a fall from the couch or running into a concrete *Page 16 
pillar as the cause of Logan's injuries. (1T. at 233-234). The medical testimony established that these injuries would manifest themselves by symptoms of an altered state of consciousness. (1T. at 239). Finally, Dr. McDavid testified that the acute ischemia, i.e. the "swelling injury" "doesn't happen right away . . . I mean the brain is injured and then it swells." (1T. at 232-233). That injury occurred between 8 to 12 hours and no more than 3 days before Logan was hospitalized. (1T. at 233). The subarachnoid hemorrhaging, i.e. the acute blood in the brain, caused by a blow or shaking, occurred between 3 and 5 days before Logan was hospitalized. (1T. at 233).
 {¶ 68} In the case at bar, Mr. Stewart reported that for "some time" prior to February 25, 2006 Logan was crying all night and would not calm down. (1T. at 224; State's Exhibit 2, University Hospitals Health System, Patent's Notes dated February 25, 2006). Dr. Young testified that appellant and Mr. Stewart brought Logan in for a check-up on February 24, 2006 because Logan was "crying, fussy and angry and won't eat nor follow directions." (Depo. at 19; 34).
 {¶ 69} In the case at bar, Logan displayed symptoms of difficulty eating, vomiting and seemed listless and sleepy. Sargent Gary Frascone of the Navarre Police Department testified that appellant told him that on Monday, February 27, 2006 Logan started acting "more gazey, drifting off acting like vegetable." (1T. at 324). The previous evening appellant "didn't really sleep because [she] was too worried about what was going to happen with him . . ." (2T. at 428). Logan's temperature ranged from 101 to 103 degrees. (2T. at 430). On Tuesday, February 28, 2006, Logan was a little better, but not dramatically. (2T. at 435). Dr. Asif Young, Logan's pediatrician clearly refutes the appellant's testimony that Logan had the flu or an ear infection on or about February 24, *Page 17 
2006. (Depo. At 19; 34; 37). Appellant did not mention to Dr. McDavid that Logan had been to his pediatrician on Friday, February 24, 2006 because she was concerned that he had the flu or an ear infection. (1T. at 228). In spite of his condition appellant and Mr. Stewart decided to take Logan shopping, rather than seek medical advice. (2T. at 432-433). Appellant and Mr. Stewart waited several hours after the incident involving the concrete pillar before taking Logan to the hospital. As the symptoms manifested themselves prior to the time appellant and Mr. Stewart claimed that Logan walked into the concrete pillar, that incident could not have caused the injuries. (1T. at 234).
 {¶ 70} Appellant's explanation for Logan's injuries evolved while he was hospitalized. On March 3, 2006 appellant suggested that his injuries were caused by Logan banging his head against the rails of a crib that was too small for him. (State's Exhibit 2, University Hospitals Health System, Patent's Notes dated March 3, 2006). On March 5, 2006 appellant apparently informed hospital personnel that she had a video tape of Logan falling and hitting his head in the bathtub and this may have contributed to the head trauma Logan suffered. (State's Exhibit 2, University Hospitals Health System, Patent's Notes dated March 5, 2006 at 11:16 a.m.).
 {¶ 71} Appellant's behavior was reckless because the failure to provide prompt medical attention exacerbated the severity of the injuries as the child's brain continued to swell. State v. Brooks (March 30, 2000), Cuyahoga App. Nos. 75711, 75712. Dr. McDavid testified that Logan's posturing and breathing difficulties were likely signs of herniation or the brain swelling and being pushed through a hole in the skull known as the foramen magnum. (1T. at 227). Further, appellant informed the paternal grandparents that she was going to marry Mr. Stewart the next day even though Logan *Page 18 
was still in intensive care. (2T. at 389; 397). When asked why, appellant responded they had advanced the wedding date so "they would not have to testify against each other." (Id.). The jury certainly could infer that appellant knew something was wrong but, instead of seeking medical attention, decided to cover up the couple's actions.
 {¶ 72} After reviewing the evidence, we cannot say that this is one of the exceptional cases where the evidence weighs heavily against the convictions. The jury did not create a manifest injustice by concluding that appellant was aware that her delay in seeking medical care for Logan would probably cause Logan substantial risk to the health or safety of the child. The jury also did not lose its way by concluding that appellant perversely disregarded a known risk that her delay in seeking medical care for Logan would result in serious physical harm to the child. Given the evidence adduced at trial, the jury could have reasonably determined that Logan suffered serious physical harm due to the conduct of appellant. We find no basis for concluding that a reasonable trier of fact would not have the found the essential elements of endangering a child proven beyond a reasonable doubt. *Page 19 
 {¶ 73} For the foregoing reasons, the judgment of the Court of Common Pleas, of Stark County, Ohio, is affirmed.
 Gwin, P.J., Hoffman, J., and Edwards, J., concur. *Page 20 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, of Stark County, Ohio, is affirmed. Costs to appellant.
[1] Jamie Stewart has separately appealed his conviction. See,State v. Jamie Stewart, 5th Dist. No. 2007-CA-00068. *Page 1