[Cite as *State v. Austin*, 2018-Ohio-3048.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**Nos. 106215 and 106530**

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**DAVID D. AUSTIN**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED IN PART;
REVERSED IN PART

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-16-602549-A and CR-16-612510-B

**BEFORE:** Keough, J., E.A. Gallagher, A.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 2, 2018

**ATTORNEY FOR APPELLANT**

Britta M. Barthol
P.O. Box 670218
Northfield, Ohio 44067


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Anthony Thomas Miranda
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant David Austin appeals from the trial court's judgment finding him guilty of child endangering and identity fraud, and sentencing him to an aggregate term of 42 months in prison. For the reasons that follow, we affirm in part and reverse in part.

## I. Background and Procedural History

{¶2} In January 2016, Austin was indicted in Cuyahoga C.P. No. CR-16-602549 in a five-count indictment that charged him with (1) child endangering in violation of R.C. 2919.22(B)(1); (2) endangering children in violation of R.C. 2919.22(B)(2); (3) endangering children in violation of R.C. 2919.22(A); (4) felonious assault in violation of R.C. 2903.11(A)(1); and (5) domestic violence in violation of R.C. 2919.25(A). These charges arose from an incident that occurred on September 23, 2015, in which M.R., the three-year-old daughter of Austin's girlfriend, was injured. This case was tried to a jury.

{¶3} In January 2017, Austin was charged in Cuyahoga C.P. No. CR-16-612510 with six counts of identity fraud in violation of R.C. 2913.49(B)(2) and one count of receiving stolen property in violation of R.C. 2913.51(A). He subsequently pleaded guilty to one count of identity fraud, and the remaining counts were dismissed. The matter was continued for sentencing.

{¶4} At the jury trial in CR-16-602549, M.R.'s mother, C.R., testified that she had pleaded guilty to attempted permitting child abuse relating to the events of September 23, 2015, and that as a condition of her plea agreement, she had agreed to testify truthfully at Austin's trial.

{¶5} C.R. testified that she and Austin began a romantic relationship in June 2011. She said that she and M.R. lived with Austin, his three children, and Austin's sister "pretty much all the time," even though she still kept her own apartment. She testified further that even

though Austin was not M.R.'s biological father, "he acted as one" toward M.R. C.R. said that when M.R. was at Austin's house and she was not there, M.R. was in Austin's care and he "very much" acted as M.R.'s parent.

{¶6} C.R. testified that she awoke at approximately 7 a.m. on September 23, 2015. After taking Austin's daughter to the bus stop, she returned home. She heard M.R. and Austin's daughter D.A. giggling and running around upstairs. She assumed that Austin was taking care of them "like he always did if [she] overslept or went back to sleep," so she went to sleep downstairs.

{¶7} C.R. said that she woke up around 9 a.m. and went upstairs, where she found Austin cuddling M.R. in bed. C.R. said M.R. was laying on her side and looked like she was sleeping. Austin told C.R. he had to talk to her, but she ignored him and went to the bathroom. When she returned to the bedroom, she saw that M.R. was wheezing and her eyes were half open. When C.R. picked up M.R., her skin was cold and she did not respond to C.R.'s voice or touch. C.R. ran downstairs with M.R., screaming that someone should call 911. She then ran outside, thinking the air would help M.R. breathe.

{¶8} C.R. testified that Austin's brother, who was at the house, called 911. C.R. said that by that time, Austin was in his car. C.R. testified that she screamed at Austin and pounded on the car door but Austin said nothing and drove away. Austin's daughter D.A. was in the car with him.

{¶9} C.R. spent the day at the hospital with M.R. She called Austin several times but he did not respond or come to the hospital. Several days later, Austin and C.R. exchanged the following text messages:

> Austin: You think in [sic] not sorry and bearing [sic] myself up a
> lot? You know more than anyone how I feel stop

> trying to play me like this it hurt more coming from
> you than anyone cuz u know my attentions [sic]

C.R.: Your intentions doesn't [sic] excuse you from what happen
> just give me a minute ill [sic] call

Austin: I'm not trying to excuse myself
> Do you really feel like that?
> I didn't mean to hurt [M.R.] in any way [C.R.]
> Sorry
> [M.R.] I'm sorry I apologize I love you
> Tell her

C.R.: It wasn't intentionally but in that case you need help
> you need to start now go to counseling find the root
> of it all talking to somebody helps . . .
> And I will

Austin: I am I promise

C.R.: Did you talk to attorney or did you talk to mom

Austin: What's wrong? Is she doing bad today?

C.R. Everything

Austin: Tell me what's going on!! Call me something
> Why are you leaving me in the dark?

C.R.: Cause I shouldn't f—ing have to keep you in the
> light this shouldn't of f—ing happened just should
> woke me up we should just left man this would
> never happened she asked to go to her auntie house i
> shoulda just took her I just wanna hear my baby
> laugh again

{¶10} State's exhibit No. 6, a telephone call between C.R. and Austin recorded at the request of the Garfield Heights Police Department, was played for the jury. In the call, C.R. asked Austin "how long M.R. was like that," which she testified meant she wanted to know how long M.R. was wheezing and unresponsive before C.R. found her. Austin responded that "it all happened within three to four minutes." C.R. also told Austin, "your mom said you put her in a corner three times and that's when you lost your patience." Austin responded, "I don't want to talk about it."

{¶11} On cross-examination, C.R. admitted that the Garfield Heights police had come to Austin's house on August 29, 2015, to investigate bruises on M.R. and that as a result, the

Cuyahoga County Department of Child and Family Services obtained legal custody of M.R. C.R. admitted that she never turned M.R. over to the county.

{¶12} C.R. testified that M.R. returned around 6:30 p.m. the evening before the incident after spending a few days at her aunt's house, and that she immediately threw up upon exiting the car. C.R. said that M.R. threw up two more times after she returned home, and complained about her head hurting. C.R. called the aunt, who told her that M.R. was sick because she had eaten only pizza rolls all day. C.R. testified that she did not see any bruises on M.R. when she returned from her aunt's house.

{¶13} C.R. denied that she had told the prosecutor before trial that Austin had told her that he had pushed M.R. that morning, although she admitted that Austin had previously pushed her (C.R.). She also said she had lied when she told the prosecutor and her attorney that Austin had put his hands around her neck when he was angry.

{¶14} Thomas Nemeth, a Garfield Heights firefighter and paramedic, responded to Austin's home with four other paramedics at 10:36 a.m. on September 23, 2015. He testified that he spoke with C.R., who told him that M.R. had vomited twice the day before because she had eaten bad food. Nemeth testified that he noticed bruising on M.R.'s forehead.

{¶15} Eric Cornell, a Garfield Heights police officer, also responded to the scene. He observed M.R. as she was in the ambulance and testified that he too observed bruising and swelling on M.R.'s forehead. Cornell said he spoke with C.R. to find out what had happened, and based on what she told him, he and Garfield Heights detectives searched Austin's residence and took pictures.

{¶16} Dr. Crystal Tomei, a pediatric neurosurgeon at Rainbow Babies and Children's Hospital, operated on M.R. for what Dr. Tomei characterized as "life-threatening injuries." Dr. Tomei testified that M.R.'s skull was fractured from the bottom to the middle of her skull, and

that she found both old blood and an "active bleeding vein" in M.R.'s brain. She said that such bleeds occur from "forceful impacts" and that M.R.'s skull fracture was consistent with non-accidental trauma. Dr. Tomei testified that a person who experiences a brain injury such as M.R. had may sometimes have a lucid interval after they are initially knocked out before they decline, but others will never wake up and just progressively decline. She testified further that an individual with an injury such as M.R.'s "would not likely be awake enough to be able to convey that they had headaches."

{¶17} Dr. Robert Tarr, a neuroradiologist at University Hospitals, reviewed the scans of M.R.'s brain before her surgery. He testified that he saw a skull fracture, as well as acute and older bleeding. He dated the acute blood in M.R.'s brain as "hours to several days old."

{¶18} Peter Stroe, the Garfield Heights police detective who investigated the case, testified that he met with C.R. at the hospital the day of the incident. He admitted that he was never told that M.R. had stayed at her aunt's house for a few days prior to the incident, and that he only learned of the old blood in M.R.'s brain during trial. He testified that such information would not have changed the course of his investigation, however, because he believed Austin's text messages to C.R. and the recorded telephone call incriminated Austin.

{¶19} Austin testified in his own defense. He said that whichever adult was awake first would do the "morning routine" with the children. He said that on the morning of September 23, 2015, he awoke to find his daughter and M.R. watching TV in his bedroom. He told them to go brush their teeth and then come back upstairs to get their clothes on. Austin said that M.R. never came back upstairs, and when he found her in the downstairs bathroom, she was just "staring into space." Austin showed M.R. where the toothpaste was and told her to come upstairs when she was done brushing.

**{¶20}** Austin said that M.R. did not come back up, so he went down again and asked her what was wrong. M.R. told Austin she did not know what she was supposed to be doing. Austin said he began putting M.R.'s clothes on her but realized the shorts he had picked out did not match her shirt, so he told her to go upstairs, get another pair of shorts, and come back downstairs.

**{¶21}** Austin said that when M.R. did not return, he went upstairs. After putting M.R.'s shorts on, Austin told her to stand in the corner because she had "not been listening" that morning. Austin said that when he went back upstairs, M.R. was standing at the top of the stairs. Austin said he asked M.R. if she knew why she was in trouble, and when she did not respond, he "tapped" her leg to get her attention. According to Austin, M.R. "jumped back" and slipped on a cup on the floor. Austin said that when M.R. got up, he asked her if she was okay. M.R. came to Austin and told him her head hurt. Austin said he got ice from downstairs, brought it upstairs and put it on M.R.'s head, and then C.R. came upstairs.

**{¶22}** Austin testified that he left the house because his daughter D.A. became hysterical upon observing C.R. and M.R. He testified further that in his text messages to C.R., he was apologizing because he was sympathetic about the "situation," not because he had injured M.R. He also testified that his promise to go to counseling was because he has a problem opening up to people, not because he has anger issues. On cross-examination, Austin admitted that the carpet at the top of the stairs where M.R. allegedly fell is thick.

**{¶23}** At the close of the evidence, the trial court granted defense counsel's Crim.R. 29 motion in part and dismissed Count 5, domestic violence.

**{¶24}** During deliberations, the jury advised the court that it was unable to reach a verdict on all counts, and the trial court gave a *Howard* charge. On September 2, 2016, after the jury again advised the court that it was unable to reach a verdict on three of the four counts, the trial

court accepted the guilty verdict on Count 3, child endangering violation of R.C. 2919.22(A) with a furthermore clause that the violation resulted in serious physical harm, and declared a mistrial on the remaining counts. The state indicated that it would retry Austin on the remaining charges.

{¶25} In the ensuing months Austin's trial counsel withdrew, and Austin obtained new counsel who engaged in discovery, including obtaining an expert report that the defense provided to the state. The trial court held several pretrials and eventually set trial on the remaining counts for August 7, 2017.

{¶26} On August 6, 2017, Austin filed a motion for new trial based on newly discovered evidence and/or for postconviction relief under R.C. 2953.23. The trial court orally denied the motion at the sentencing hearing, but told Austin if he refiled his motion after sentencing, the court would give it full consideration. The trial court did not enter a judgment entry setting forth its ruling denying the motion.

{¶27} At sentencing, the state dismissed Counts 1, 2, and 4 without prejudice. The trial court sentenced Austin to 30 months in prison, to run consecutively to the 12-month sentenced imposed in CR-17-612510.

{¶28} On August 11, 2017, Austin refiled his motion for a new trial based on newly discovered evidence and/or for postconviction relief. On September 7, 2017, Austin filed a notice of appeal in both cases, which were consolidated for briefing, hearing, and disposition. Subsequently, on November 21, 2017, the trial court denied Austin's motion in part, ruling that the motion for a new trial was denied but the petition for postconviction relief was still pending. On April 3, 2018, the trial court denied the petition for postconviction relief.

## II.   Law and Analysis

### A.   Sufficiency of the Evidence

**{¶29}** In his first assignment of error, Austin contends that the trial court erred in denying his Crim.R. 29 motion for acquittal because there was insufficient evidence to support his conviction for endangering children.

**{¶30}** A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶31}** Austin was convicted of endangering children in violation of R.C. 2919.22(A), which provides in pertinent part:

> No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

A specification charged that Austin's violation of R.C. 2919.22(A) resulted in serious physical harm to M.R.

**{¶32}** The mens rea for child endangering pursuant to R.C. 2919.22(A) is recklessness. *State v. McGee*, 79 Ohio St.3d 193, 680 N.E.2d 975 (1997), syllabus. A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C).

{¶33} Thus, to prove Austin guilty of child endangering in violation of R.C. 2919.22(A), the state was required to demonstrate that (1) Austin was the parent, guardian, custodian, person having custody or control, or person in loco parentis of M.R., and (2) that he recklessly violated a duty of protection, care, or support that (3) created a substantial risk to M.R.'s safety. *State v. Stewart*, 5th Dist. Stark No. 2007-CA-00059, 2007-Ohio-6118, ¶ 51. To prove Austin guilty of the specification attached to the charge, the state was required to prove that Austin's reckless violation of his duty of care caused severe physical harm to M.R.

{¶34} Our review of the record demonstrates that, viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support each element of the offense. Although Austin contends there was no evidence that he was in loco parentis of M.R., R.C. 2919.22(A) includes person having "custody or control" of the child as potential offenders of the statute. "'Custody or control' in R.C. 2919.22(A) has been defined as more than a casual relationship but less than in loco parentis." *State v. Stout*, 3d Dist. Logan No. 8-06-12, 2006-Ohio-6089, ¶ 17. Thus, in *State v. Smith*, 8th Dist. Cuyahoga No. 68745, 1996 Ohio App. LEXIS 214, *22 (Jan. 25, 1996), this court found that a grandfather had "custody or control" over his grandchildren where the grandchildren and their mother had lived with the grandparents for over two years. Likewise, in *State v. Schoolcraft*, 11th Dist. Portage No. 91-P-2340, 1992 Ohio App. LEXIS (May 29, 1992), the court found that the mother's boyfriend, who gave the child a bath while the mother was not at home, "exerted control over the child victim, and control alone has been found to be sufficient to satisfy that element of R.C. 2919.22(A)." *Id.* at *3.

{¶35} Here, C.R. testified that she and M.R. lived with Austin "pretty much all the time" and that he "very much" acted as M.R.'s parent. C.R. testified that she was sleeping the morning of September 23, 2015, and that Austin "always" took care of the children if she was sleeping. Austin testified while C.R. was sleeping, he began the "morning routine" with his

daughter D.A. and M.R., telling them to brush their teeth and get their clothes. Thus, at a minimum, Austin had control of M.R. that morning, which satisfied that element of R.C. 2919.22(A).

{¶36} We also find there was sufficient evidence that Austin recklessly created a substantial risk to M.R.'s health or safety by violating his duty of protection and care. This court has recognized that the Ohio Supreme Court has distinguished between two types of child endangering in R.C. 2919.22 by explaining that section (A) of the statute is aimed at preventing acts of omission or neglect involving a child, while section (B) deals with affirmative acts of physical abuse. *Cleveland Hts. v. Cohen*, 8th Dist. Cuyahoga No. 101349, 2015-Ohio-1636, ¶ 27, citing *State v. Kamel*, 12 Ohio St.3d 306, 308, 466 N.E.2d 860 (1984).

{¶37} An adult in control of a child has a clear duty imposed by law to protect that child from abuse and to care for the child's injuries. *State v. Gaver*, 5th Dist. Stark No. 2015CA00204, 2016-Ohio-7055, ¶ 55. Thus, it is not necessary to show an actual instance or pattern of physical abuse on the part of the accused to support a conviction under R.C. 2919.22(A). *Id.,* citing *Kamel* at 309. "It is an offense under R.C. 2919.22(A) when one fails, without excuse, to act in discharge of one's duty to protect one's child, where the result is a substantial risk to the child's health or safety." *Id.*

{¶38} Thus, in *Gaver*, the court found the defendant's conviction for child endangering under R.C. 2919.22(A) supported by sufficient evidence and not against the manifest weight of the evidence where the medical evidence demonstrated that the child's serious physical injuries resulted from violent forceful trauma that occurred while the child was in the defendant's care. The court found that the jury could have reasonably inferred that the defendant was responsible for the child's injuries, or it could have inferred that the defendant failed to protect the child from such injury.

{¶39} Here, the evidence demonstrated that M.R. sustained life-threatening injuries while she was under Austin's care. Even if the evidence was insufficient to demonstrate that Austin caused the injury, the evidence was sufficient to demonstrate Austin violated his duty of care and protection of M.R. by failing to protect her from such injuries.

{¶40} Although Austin contends there was no evidence regarding when M.R.'s skull fracture occurred, Dr. Tomei testified that someone with an injury such as M.R.'s would not likely be awake enough to convey that they had headaches. M.R. was, in fact, nonresponsive when C.R. found her around 9 a.m., even though only two hours earlier, she had been giggling and running around the house. As admitted by Austin, M.R. was in his care that morning while C.R. was sleeping. Thus, despite C.R.'s testimony that M.R. complained of a headache the evening before, Dr. Tomei's and Austin's testimony, if believed, was sufficient to establish that M.R.'s skull fracture — the injury that caused the active bleeding in her brain and made her nonresponsive — occurred while she was under Austin's care. If it had occurred the evening or even days prior to September 23, 2015, M.R. would not have been able to communicate. Accordingly, even if the jury believed that Austin may not have caused M.R.'s injury, the evidence was sufficient to establish that Austin, as the sole caregiver when M.R. sustained her injury, breached his duty to protect M.R. from serious physical harm while she was in his care. And if M.R. was complaining of a headache the evening before, as C.R. and Austin testified, Austin's failure to protect M.R. from any further head injury was indeed reckless under the circumstances.

{¶41} Furthermore, the evidence was sufficient to establish that Austin recklessly violated his duty of care to M.R. by failing to seek medical attention for her. Austin testified that he believed M.R. fractured her skull the night before September 23, 2015, while she was at her aunt's house. He testified that on the morning of September 23, 2015, M.R.'s behavior was

"different than on other mornings" because she told him she "didn't know what she was supposed to be doing," was "just staring into space," "not paying attention to nothing [sic] that was going on," "not listening," and not responding to his questions. If this was true, and if it was true, as Austin testified, that M.R. vomited and complained of a headache the evening before after returning home from her aunt's house, Austin's failure to seek immediate medical attention for M.R. that morning after she allegedly began demonstrating signs of a head injury was certainly reckless and a violation of his duty of care.

{¶42} Furthermore, if M.R. was injured on the morning of September 23, 2015, while in Austin's care, the evidence was sufficient to establish that Austin recklessly violated his duty of care to M.R. after her injury. Austin testified that he put ice on M.R.'s head. However, he then just laid in the bed with her, without calling for C.R.'s help or calling 911, despite the fact that M.R. was *totally nonresponsive*.

{¶43} And then, knowing that 911 had been called, he left the scene. He did not stay to tell the paramedics what had happened, even though M.R. had been in his care when the injury happened and he could have assisted the paramedics in their evaluation and treatment of M.R. by telling them what happened. Moreover, Austin left with his daughter D.A., who was in the home when the injury occurred and may have been able to tell the paramedics what had happened.

{¶44} Considering the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of child endangering in violation of R.C. 2919.22(A) proven beyond a reasonable doubt. The first assignment of error is overruled.

**B. Manifest Weight of the Evidence**

{¶45} In his second assignment of error, Austin contends that his conviction for endangering children was against the manifest weight of the evidence.

**{¶46}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598 at ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541 (1997). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶47}** Austin contends his conviction was against the manifest weight of the evidence because there was no testimony that he was responsible for M.R.'s injuries. He argues that there was both old and new blood in M.R.'s brain, and that M.R. complained of a headache and vomited several times after returning from her aunt's house, apparently suggesting that the aunt caused M.R.'s injuries, which manifested as life-threatening the morning after she returned home.

**{¶48}** The evidence was undisputed that Austin was caring for M.R. the morning of September 23, 2015. He testified that he was doing the "morning routine" with the girls, and C.R. testified that Austin was taking care of the girls while she was sleeping.

**{¶49}** And despite Austin's argument otherwise, the evidence established that M.R. incurred her life-threatening injuries while she was in Austin's care. Dr. Tomei testified that someone with a skull fracture such as M.R.'s would not be awake enough to tell anyone they had a headache. Thus, if M.R.'s skull had been fractured the evening or days before, as Austin seems to suggest, she would not have been able to tell anyone that she had a headache. But the evidence established that M.R. was communicative when she returned home from her aunt's

house, and that on the morning of September 23, 2015, she was giggling and running through the house, obviously alert enough to talk and respond.  Two hours later, however, after being in Austin's care, M.R. was totally nonresponsive.  Austin admitted in his text to C.R. that he was "beating himself up a lot" for what had happened.

{¶50} Thus, even if the jury did not believe that Austin caused the skull fracture, based on the evidence, it could have reasonably found that M.R.'s life-threatening injury occurred while she was in Austin's care, and that he therefore recklessly breached his duty to protect her from serious physical harm.

{¶51} Furthermore, the jury could have reasonably found that Austin failed to seek medical attention for M.R., in violation of his duty of care.  Although Austin testified that he put ice on M.R.'s head after she fell, he admitted he did not call 911, despite M.R.'s nonresponsiveness, and that he left the scene with his daughter after 911 was called, even though he could have given the paramedics valuable information about what had happened to assist in their evaluation and treatment of M.R.  In light of M.R.'s serious injury and condition, the jury could have reasonably concluded that Austin's failure to remain on the scene and speak to the paramedics was another breach of his duty of care to M.R.

{¶52} We do not find that this to be the exceptional case where the evidence weighs heavily against the conviction. The jury did not lose its way in finding Austin guilty of child endangering in violation of R.C. 2919.22(A).   The second assignment of error is overruled.

## C.     Flight Instruction

{¶53} In his third assignment of error, Austin contends that the trial court erred   in giving the jury a flight instruction.

{¶54} A trial court has discretion to determine whether the evidence adduced at trial was sufficient to warrant an instruction.  *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-903, 883

N.E.2d 1052, ¶ 72. We review the giving of a jury instruction for an abuse of discretion. *State v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35.

{¶55} In this case, the trial court gave the following instruction to the jury regarding flight:

> Testimony has been admitted indicating that the defendant fled the scene. You're instructed that the fact that the defendant fled the scene does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt.
>
> If you find that the facts do not support that the defendant fled the scene or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged.

{¶56} "Flight from justice may be indicative of a consciousness of guilt." *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30. However, "a mere departure from the scene of the crime is not to be confused with a deliberate flight from the area in which the suspect is normally to be found." *Id* A "defendant's conduct of leaving the scene of the crime does not warrant a flight instruction where there is no evidence of deliberate flight in the sense of evading police." *State v. Dunn*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, ¶ 48; *State v. Johnson*, 8th Dist. Cuyahoga No. 99715, 2014-Ohio-2648, ¶ 110. To warrant an instruction, it must be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime. *Id*. at ¶ 52; *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, ¶ 46.

{¶57} We find that the facts of this case did not warrant a flight instruction. Austin's leaving the scene was not deliberate flight in the sense of evading police and detection. In fact,

Detective Stroe testified that after he met with C.R. at the hospital on September 23, 2015, he asked her to contact Austin and ask him to contact the police so he could interview him. There was no testimony that Austin could not be located by the police or that he tried to evade them once located.

{¶58} Nevertheless, Austin has not demonstrated that the error was prejudicial. "'A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.'" *Jackson* at ¶ 49, quoting *State v. McKibbon*, 1st Dist. Hamilton No. C-010145, 2002-Ohio-2041, ¶ 4. To determine whether an erroneous instruction was prejudicial, a reviewing court must examine the jury instructions as a whole. *State v. Shepherd*, 8th Dist. Cuyahoga No. 102951, 2016-Ohio-931, ¶ 25, citing *State v. Harry*, 12th Dist. Butler No. CA2008-01-013, 2008-Ohio-6380, ¶ 36. A jury instruction constitutes prejudicial error where it results in a manifest miscarriage of justice. *State v. Hancock*, 12th Dist. Warren No. CA2007-03-042, 2008-Ohio-5419, ¶ 13. Conversely, however, errors, defects, irregularities, or variances that do not affect substantial rights are to be disregarded. Crim.R. 52(A).

{¶59} After reviewing the jury instructions as a whole, we cannot say that the trial court's instruction on flight resulted in a manifest miscarriage of justice. The instruction given, although improper, allowed the jury to make its own conclusion regarding whether Austin fled the scene and to consider his motivations for doing so. The instruction correctly advised the jury not to consider evidence of Austin's departure from the scene if they found it was not motivated by a consciousness of guilt. *State v. Hill*, 8th Dist. Cuyahoga No. 99186, 2013-Ohio-3245, ¶ 31. Accordingly, we find the instruction was harmless beyond a reasonable doubt. The third assignment of error is therefore overruled. **D. Motion for New Trial**

{¶60} In his fourth assignment of error, Austin contends that the trial court erred in denying his motion for a new trial on November 21, 2017.

{¶61} Although Austin asserts that the trial court's journal entry of November 21, 2017, denied the motion for a new trial that was filed on August 6, 2017, the record is clear that the trial court orally denied that motion during the sentencing hearing on August 7, 2017, but never entered a journal entry setting forth its ruling. Austin then refiled his motion for new trial and/or for postconviction relief on August 11, 2017. The trial court's journal entry of November 21, 2017, denying the motion for new trial pertains to the motion filed on August 11, 2017.

{¶62} However, Austin filed his notice of appeal in these cases on September 7, 2017. Once an appeal is taken, the trial court is divested of jurisdiction until the case is remanded to it by the appellate court, except where the retention of jurisdiction is not inconsistent with that of the appellate court to review, affirm, modify, or reverse the order from which the appeal is perfected. *State v. Abboud*, 8th Dist. Cuyahoga Nos. 87660 and 88078, 2006-Ohio-6587, ¶ 11. A motion for a new trial is inconsistent with a notice of appeal of the judgment sought to be retried. *Id.* Therefore, a notice of direct appeal divests the trial court of jurisdiction to consider a motion for a new trial. *Id.*

{¶63} Here, because Austin's appeal was pending before this court on September 7, 2017, when the trial court ruled on the motion for a new trial, the trial court had no jurisdiction to rule on the motion. Where a trial court enters an order without jurisdiction, its order is void and a nullity. *Id.* at ¶ 13. A void judgment puts the parties back in the same position they would be in if it had not occurred. *Id.*

{¶64} The fourth assignment of error is sustained.

E.    **Consecutive Sentences**

{¶65} In his fifth assignment of error, Austin contends that the trial court erred in imposing consecutive sentences because it did not make the necessary factual findings to impose consecutive sentences. Austin's argument is without merit.

{¶66} Consecutive sentences may be imposed only if the trial court makes the required findings pursuant to R.C. 2929.14(C)(4). *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.23d 659, ¶ 20-22. Under the statute, consecutive sentences may be imposed if the trial court finds that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) that any of the following applies:

> (1) the offender committed one or more of the multiple offenses while awaiting trial or sentencing, while under a sanction, or while under postrelease control for a prior offense;

> (2) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of the courses of conduct adequately reflects the seriousness of the offender's conduct; or

> (3) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶67} To impose consecutive sentences, the trial court must both make the statutory findings mandated under R.C. 2929.14(C)(4) at the sentencing hearing and incorporate those findings into its sentencing entry. *Bonnell* at the syllabus.

{¶68} The trial court made all the required findings to impose consecutive sentences. It found that consecutive sentences were necessary to protect the public from future crime and to punish Austin. (Tr. 875.) It found that consecutive sentences were not disproportionate to the seriousness of Austin's conduct and the danger he poses. (Tr. 875.) And it found that Austin

had committed the identity fraud offense while he was awaiting trial in the child endangerment case. (Tr. 876.)

{¶69} The trial court likewise incorporated its findings into the journal entry of sentencing. Because the trial court properly imposed consecutive sentences, the fifth assignment of error is overruled.

{¶70} Judgment affirmed in part; reversed in part.

It is ordered that the parties share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EILEEN A. GALLAGHER, A.J., CONCURS;
EILEEN T. GALLAGHER, J., CONCURS WITH SEPARATE CONCURRING OPINION


EILEEN T. GALLAGHER, J., CONCURRING WITH SEPARATE OPINION:

{¶71} I concur with the majority's judgment, but write separately because I believe the flight instruction was justified by the evidence adduced at trial and, therefore, was not given in error, harmless or otherwise.

**{¶72}** Flight from justice may be indicative of a defendant's consciousness of guilt. *State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82. In *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, we held that a mere departure from the scene of a crime is not to be confused with deliberate flight to avoid detection. We concluded that the flight instruction in that case was not warranted because there was no indication that Jackson left the scene for the purpose of evading the police. Although one of the victims called 911 while Jackson continually fired his gun at the victims, there was no evidence that Jackson knew that 911 had been called. Jackson only left the scene when he had sufficiently terrorized everyone in the home.

**{¶73}** A flight instruction on consciousness of guilt based on the flight of the accused is appropriate when supported by sufficient evidence in the record. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 49. As noted by the majority in paragraph 43, the evidence in this case showed that Austin left the scene the moment his brother called 911. In contrast to *Jackson*, who seems to have left the scene because his mission was accomplished, Austin fled the scene because the authorities were coming. Therefore, because there was evidence that Austin fled the scene the moment the authorities were called, I believe there was evidence to warrant the flight instruction in this case.

**{¶74}** The majority concludes that the flight instruction was not warranted because Austin did not hide from the police when they later searched for him. This may be a valid point, but it suggests that an initial decision to flee followed by a later decision to cooperate with police does not warrant a flight instruction. I disagree. The initial decision to flee may indicate consciousness of guilt regardless of a subsequent change of mind.

**{¶75}** The majority observes that the flight instruction correctly advised the jury not to consider evidence of Austin's departure from the scene if they find it was not motivated by consciousness of guilt. Thus, the jury would determine the weight, if any, to be given to

Austin's initial flight from the scene in light of his subsequent cooperation with police. But because Austin's initial decision to flee was motivated by the imminent arrival of the police, I believe the flight instruction was appropriately given in this case.

KEY WORDS: